## GULF & SHIP ISLAND RAILROAD COMPANY *v.* LAUREL COTTON MILLS.

### [45 South., 982.]

CARRIERS. *Contracts. Rates. Interstate Commerce. Violation of law. Railroads. Pleadings.*

To a declaration charging the breach of a contract by a railroad company to maintain designated rates from a factory to competing points and to credit plaintiff on freight charges on manufactured goods with all freights paid it by plaintiff on raw material carried to the factory, pleas are good which set up:—

(*a*) That when the contract was made, defendant was a common carrier engaged in interstate as well as domestic commerce; that it then had published schedules showing rates charged, and that rates specified in the contract are less than those contained in the published schedules, since the facts pleaded show that the contract was made in violation of the act of Congress, February 4, 1887, 24 Stat's 379; and

(*b*) The same facts, coupled with the additional charge that the published schedule of rates had been filed as required by act of Congress, February 4, 1887, ch. 104, § 6, Stat. 380, and amendment thereto, March 2, 1889, § 1, 25, Stat. 855.

FROM the circuit court of, first district, Hinds county.

HON. ROBERT L. BULLARD, Judge.

The Laurel Cotton Mills, appellee, was plaintiff in the court below; the railroad company, appellant, defendant there. From a judgment in plaintiff's favor the defendant appealed to the supreme court.

The suit was upon a written contract which was as follows:

" This memorandum of contract, made this seventh day of February, 1900, by and between the Laurel Cotton Mills Company, a corporation under the laws of the state of Mississippi,

of Laurel, Mississippi, party of the first part, and the Gulf &
Ship Island Railroad Company, of Mississippi, party of the
second part, witnesseth:    The Laurel Cotton Mills Company, or
party of the first part, proposes to construct and operate a cotton
mill at Laurel, Jones county, Mississippi, and in consideration
of the covenant herein agreed to be kept and performed by the
parties of the second part, it agrees to locate and build the said
cotton mill and warehouses belonging to same on the ground now
staked out as agreed upon, accessible from the said Gulf & Ship
Island Railroad Company, and further agrees to the right of way
for necessary switches to connect the track of the Gulf & Ship
Island Railroad Company from both directions with the cotton
mill grounds and buildings.    The party of the second part,
in consideration of the performance of the above-named cov-
enant of the party of the first part, agrees to maintain in
effect rates on manufactured goods produced by the said Laurel
Cotton Mills, not exceeding, to competitive points, the rates
effective from Stonewall and Meridian, Mississippi, on the dates,
and further agrees to maintain in effect a milling in transit
arrangement for the cotton to be manufactured at the said
Laurel Cotton Mills; that is to say, any freight charges that
may be paid on cotton shipped from stations between Hatties-
burg and Jackson, or on the Laurel branch on the lines of the
said Gulf & Ship Island Railroad Company, to the Laurel
Cotton Mills, shall be allowed and credited, pound for pound,
as part payment of freight charges on the manufactured goods
or products when shipped to market over the lines of the
said Gulf & Ship Island Railroad Company.    This arrange-
ment to continue for a period of ten years.    Party of the
second part further agrees to deliver at New Orleans' rates
all materials, machinery, and supplies used in the construction
of the said cotton mills as first built, or future additions thereto
of main buildings, or additional machinery, that increases the
capacity of the plant, when shipped from points north or
east of Birmingham, and in case coal should be required by

the said Laurel Cotton Mills, and provided they wish to ship same by the New Orleans & Northeastern Railroad to Laurel, the charges for switching from said railroad to the Laurel Cotton Mills shall not exceed two dollars and fifty cents ($2.50) per car."

The case was in the supreme court once before, and was then decided on a demurrer to the declaration. A statement of facts appears in the report of the former decision. *Laurel Cotton Mills* v. *Gulf & Ship Island Railroad Company*, 84 Miss., 339; 37 South., 134; 66 L. R. A., 453. On the second trial the defendant filed a number of pleas to the declaration, and to these pleas demurrers were interposed, which were sustained by the court below, and the defendant declining to plead further, judgment was entered for plaintiff.

The fourth plea of defendant was as follows:

"(4) The defendant, by its attorney, for further plea herein says that the plaintiff is precluded from maintaining this action, because it says that it is, and was when said contract sued on was entered into, a common carrier engaged in interstate as well as domestic commerce; that when said contract was entered into, and afterwards until the institution of this suit, it had caused to be printed and kept open to public inspection schedules showing the rates and fares and charges for transportation of persons and property which it had established and which were in force at the time upon its route; that said schedules had been printed in large type, and copies thereof for the use of the public had been posted in two public places in every depot, station, or office of defendant where passengers or freight, respectively, were received for transportation, in such form that they were accessible to the public and could be conveniently inspected; that no notice of any kind of a reduction of such published rates was given by defendant before entering into said contract, or afterwards, that the rates specified in said contract sued on are a less compensation for the transportation of property than is speci-

fied in said published schedule of rates, fares, and charges, and that said contract is in violation of the act of Congress of the United States, entitled 'An act to regulate commerce,' approved February 4, 1887, and is unlawful and void. And this the defendant is ready to verify."

To this plea, the plaintiff interposed the following demurrers:

General demurrer to plea No. 4: "Now comes the plaintiff, by its attorneys, and says that the said plea and the matters therein contained, in manner and form as the same are therein stated and set forth, are not sufficient in law for the defendant to have and maintain its defense against the said plaintiff, and that it, the plaintiff, is not bound by law to answer the same. Wherefore, for want of a sufficient plea in this behalf, the plaintiff prays judgment," etc.

Special demurrer to plea No. 4: "Now comes the plaintiff, by its attorneys, and says that the said plea and the matters therein contained are not sufficient in law for the defendant to have or maintain its defense therein set out against the plaintiff, and that the plaintiff is not bound to answer the same. Plaintiff states and shows to the court here the following causes of demurrer to the said plea: First. It is not shown by said plea that defendant could not lawfully have amended its schedules, showing the rates and fares and charges for the transportation of persons and property which it had established and which were in force at the time when the contract declared on was executed and afterwards, so that it could lawfully have performed all of the obligations as to rates and freight charges imposed upon it by the said contract. Second. Because the defendant could lawfully have amended its schedules, showing the rates and fares and charges for the transportation of persons and property which it had established and which were in force at the time the contract declared on was executed and afterwards, so that it could lawfully have performed all of the obligations as to rates and freight charges imposed upon it by the said contract. Third. It is not shown by said plea that

the schedules therein described, which were in force at the date of the execution of the contract declared on, had at said date been filed with the Interstate Commerce Commission, as required by § 6 of the act of Congress creating said commission, approved February 4, 1887. Fourth. It is not shown by the said plea that the schedules therein described, in force at the date when the mill constructed by plaintiff had been completed and the defendant entered upon the performance of the obligations imposed upon it by the contract herein declared on, as set out in plaintiff's declaration, as to the rates and freight charges therein described, had been filed with said Interstate Commerce Commission. Wherefore, for want of a sufficient plea in this behalf, plaintiff prays judgment," etc.

The seventh plea filed by defendant was as follows:

" (7) And for further plea in this behalf defendant says that at the time of the making of the contract exhibited with plaintiff's declaration defendant was engaged in the business of interstate commerce and that the said contract contemplated interstate as well as intrastate shipments, and that prior to and at the time of the making of the said contract the defendant had printed, promulgated, and kept open to public exhibition schedules showing the rates and charges for transportation of freight, especially of cotton and cotton goods, which said schedules and tariffs were and had been duly printed, promulgated, filed, and kept open for public inspection, as provided by act to regulate commerce, approved February 4, 1887, and the amendment thereto approved March 2, 1889, and that said rates, schedules, and tariffs provided and contracted for in the said contract filed with plaintiff's declaration vary from the tariff of charges so issued, fixed, printed, and promulgated, and were, for the transportation of cotton and cotton goods, less compensation than the compensation named in said tariffs so printed, promulgated, and filed with the commission and in force at the time; and so defendant says that the said contract being in

violation of a statute of the United States of America, was and is utterly void, all which defendant is ready to verify."

To this plea the following demurrers were interposed by plaintiff:

General demurrers to plea No. 7:   " Now comes the plaintiff, by its attorneys, and says that the said plea numbered 7 and that matters therein contained, as the same are therein stated and set forth in manner and form are not sufficient in law for the defendant to have and maintain its defense against said plaintiff, and that the plaintiff is not bound by law to answer the same.   Wherefore, for want of sufficient pleas in this behalf, plaintiff prays judgment," etc.

Special demurrer to plea No. 7:   " Now comes the plaintiff, by its attorneys, and prays that the said plea numbered 7 and the matters therein contained, as the same are therein stated the defendant to have or maintain his defense therein set out against the plaintiff, and that the plaintiff is not bound by law to answer the same.   Plaintiff states and shows to the court here the following causes of demurrer to the said pleas: First. It is not shown by said pleas that, if the defendant should perform the obligations imposed upon it by the contract herein declared on, it would be required to charge, demand, collect, or receive from the plaintiff less compensation for the services therein stipulated to be performed by it in the transportation of the property of plaintiff than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind or character under substantially similar circumstances and conditions.   Second. It is not shown by said plea that, if the defendant should perform the obligations imposed upon it by the said contract, it would be required to make or give any undue or unreasonable preference or advantage to the plaintiff, or to any locality, or to the particular description of traffic described in said contract in any respect whatsoever.   Third. It is not shown by said plea that, if

the defendant should perform the obligations imposed upon it by the said contract, it would be required to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. Wherefore, for want of a sufficient plea in this behalf, plaintiff prays judgment," etc.

*McWillie & Thompson* and *James H. Neville,* for appellant.

The pleas filed in this case, which have been demurred to, question the validity of the contract sued on. As the court will see from an inspection of the record, the defendant by demurrer to the declaration challenged the sufficiency of this contract on its face, insisting that by its terms, and without reference to the facts, other than those that appeared on its face, it was violative of the law and void. This contention was denied by this court which held that so far as the contract itself shows, it is valid, and that the defense which was sought to be raised by demurrer should be raised by plea. We call the court's attention to the fact that there is not a line or word in the opinion of this court in this case which disposes of its merits. We quote the language of the court: " The contract upon its face is valid and susceptible of enforcement. It may be that in its practical effect, it works unlawfully and constitutes an unjust discrimination. If so, it falls within the condemnation of the law, but whether or not, this be its effect, is a question, not of law, but purely of fact. It may be that the contract is non-enforcible, because an unauthorized deviation from established rates, but it is also a question of fact. We decide that the contract is not void upon its face, and we decide nothing more." *Laurel Mills* v. *Railroad Co.,* 84 Miss., 371, s.c., 37 South., 134.

The object of the pleas which were filed in this case are to show the facts which constitute the invalidity of the contract, and to make apparent to the court the deviations from estab-

lished rates and the unjust discriminations.  Having these considerations before us, let us approach the pleas and demurrers.

The fourth plea sets up the invalidity of the contract because it is in violation of § 6 of Interstate Commerce Act, entitled, " An Act to Regulate Commerce," approved February 4, 1887, First Supplement Revised Statute of the United. States, page    ; by averring that prior to, and at the time that the contract sued on was executed, the defendant was a common carrier, engaged in interstate as well as in domestic commerce, and that at the same time and prior thereto, it had caused to be printed and kept open schedules showing the rates and charges of transportation and persons; said schedules had been printed and published and promulgated as required by law, and posted so that they could be conveniently seen and read by plaintiff and all others, and that prior to the said contract no notice of any kind of any reduction of rates was given, and that the said contract stipulated and provided for rates which were a deviation from the said published rates, in that they were lower.  This plea is demurred to, first, on the ground that it does not constitute a defense, and second, on the ground that the form of the plea is not sufficient: first, in that it does not show that the defendant could not lawfully have amended its schedules, the demurrer insisting that it was perfectly competent for the defendant, after the contract had been made, to amend its schedules and tariffs so as to conform to the contract; and, second, because the plea does not show that at the time the contract was made, or the mill erected, the schedules and tariffs were filed with the Interstate Commerce Commission.

Section 6 of the Federal Statutes provides that every common carrier engaged in interstate commerce shall print and keep open to public inspection schedules, showing the rates, fares and charges for the transportation and property, which said schedules plainly printed in large type and posted in two public or conspicuous places in its depot, station or office; and clause " E " of the same section provides that copies of all schedules,

rates, fares and charges shall be filed with the commission. The third and fourth paragraphs of said section are as follows:

### " NOTICE OF CHANGE OF RATES.

· " No advance shall be made in the rates, fares, and charges which have been established and published as aforesaid by any common carrier in compliance with the requirements of this section, except, after ten days' public notice, which shall plainly state the changes proposed to be made in the schedule then in force, and the time when the increased rates, fares, or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection. Reduction in such published rates, fares or charges shall only be made after three days' previous notice, to be given in the same manner that notice of an advance in rates must be given.

### " PUBLISHED RATES NOT TO BE DEVIATED FROM.

" And when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may be at the time in force."

It is too apparent for argument, upon a mere inspection of this plea, that it charges a violation of the law and a deviation from existing tariffs, and if it be a violation of the law to deviate from a tariff, it is apparent that it is likewise a violation to agree to deviate or vary from the tariffs.

If an act is forbidden, it is as much within the prohibition of the law to agree to do the forbidden thing, as it is to do it.

The only difference is that if the forbidden act is accomplished, the party incurs a penalty, whereas if the illegal project goes no further than a mere contract to do the unlawful thing, the only consequence is that the contract is void, no punishment being thereby incurred, unless the unlawful enterprise is consummated.

The prohibition against advancing or lowering any rate without notice, contained in paragraph three, and the provision of paragraph four making it unlawful for such carrier to " charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property or for any services in connection therewith, than is specified in said published schedule of rates, fares, or charges as may at the time be in force," operate to prohibit absolutely and without qualification, any deviation whatever from published rates.   They are tantamount to § 4292 of our law which prohibits the making of rebates.

The question raised under this section is not whether the discrimination is a lawful one, nor whether the character of the traffic is substantially the same, or carried on under substantially similar conditions, but is the express prohibition against any deviation whatever from the rate established and fixed in the published tariff of charges filed with the commission, and posted as required by law.   The object of this section is to prohibit deviation from published rates and is wholly disconnected from the prohibition against unlawful discriminations. An unlawful discrimination might easily be made by means of an established printed rate, that is, the rates might be so arranged and published to operate unjustly and unfairly against a particular shipper, or class of shippers, or a locality or section of the country; and still so long as the carrier adhered to the rate he would not be guilty of a violation of this section and could not be prosecuted under it.

The cases cited by appellant all deal with discriminations and none of them pointed at these clauses.   It is apparent that

one of the objects sought to be obtained by the law was certainty, publicity and fixedness of rates, and to secure this, § 6 was enacted. Fixed published rates, open to all alike, tend to prevent evasions and violations of the law and secure equality to all shippers. Special contracts because of their susceptibility to abuse and their natural tendency to cover up and conceal evasions and violations of the law, were in all cases forbidden, and any deviation either by way of reduction or advancement from fixed published rates made criminal. On this point see *U. S.* v. *Michigan Central R. R.,* 43 Fed., 26, in which it it held that the carrying of freight or passengers at a less rate than the published tariff is a violation of law for which an indictment will lie. See also § 10, paragraph 4, which fixes penalties and makes the shipper punishable as well as the carrier.

This contract contains two separate covenants which deviate from fixed published rates. First, The agreement to allow the freight money paid on the inbound cotton as a credit on the outbound goods; and, second, a contract to put in force New Orleans rates on machinery, coal or other supplies brought in for the use of the Laurel Mills.

Of course it is clear that any contract violative of law or public policy is void. *Bohn* v. *Lowery,* 77 Miss., 424, s.c., 27 South., 604; Black on Interpretation of Laws, p. 64.

" The authorities all agree that those contracts are illegal which rest upon a consideration that is fraudulent, against morality, or against the principles of some public policy, or in contravention of some statute." 2 Beach on Contracts, § 1415.

This brings us to a consideration of the objection to the form of this plea. We submit that the question whether the defendant may or may not have amended its schedule after it made this contract so as to make the tariffs conform to the contract is utterly immaterial in this case. The violation of this agreement depends upon the status at the time the contract was made.

It was made with reference to existing schedules, and if it constituted a variation from the schedules as they then were, it is a violation of the law. If this point be well taken, then it would be utterly impossible to make or imagine a contract for a rate rebate, or to vary from existing schedules which would be void, because the complaint could always be answered by the contention that the contract contemplated an alteration of the tariffs to conform thereto, and that the whole tariffs could be so amended, after the making of the illegal agreement, so as to conform all the tariffs to the contemplated rate, that is the rate concerning which the parties desired to make a contract. This is manifestly unsound. As heretofore suggested, the test by which this contract is to be tried is the conditions and status at the time it was made, not at some subsequent date. Looking at this plea, we see that at the time the contract was entered into, the carrier had in force certain schedules and tariffs, lawfully promulgated, lawfully made and lawfully filed which were varied and reduced by the contract. That is to say that the contract constituted a variation and reduction from these tariffs. If this be true, that is the end of the matter. It was unlawful to vary from the existing tariffs and it was unlawful to make a contract that did vary from existing tariffs. The only way in which this contract could have been valid would have been prior to its execution to have given notice as required by paragraph 3 of § 6 of the reduction and have conformed to the tariff and the intentions of the contract before the contract was entered into. Your Honors will observe that this is a suit upon a contract and not upon an agreement to thereafter put into effect a rate which would conform to the contract. In this suit the violation of the contract as originally written is in issue and by the conditions existing at that time it must stand or fall.

The complaint that the plea does not show that the tariffs were filed with the commission is purely formal, and will not, we think, prevail. We think that the plea sufficiently sets

forth a compliance with § 6 of the Interstate Commerce Acts in the matter of filing tariffs, but if mistaken in this, it is very easy to amend the pleas so as to set up the fact, if indeed the seventh plea which sets up practically the same defense the filing of tariffs is abundantly set up.

The seventh plea is practically a repetition of the fourth, except that it sufficiently charges the filing of the schedules and tariffs with the Interstate Commerce Commission. All of the observations made on the fourth plea are applicable to this, but we desire to append the following additional suggestions:

In another part of this brief we have taken position that it is necessary, which we do not conceive it to be because by any deviation from a published tariff is unlawful, and that a contract so to do is, therefore, void. So far have the courts gone on this question that it has been uniformly held, without deviation or shadow of turning, that where, even by mistake, a less rate than the public tariff sheet discloses, has been quoted the contract to carry at such less rate is void, because a violation of the Interstate Commerce Act. 4 Elliott on Railroad, § 1565, page 24–34, note 2, and cases cited. *S. F. & A. R. R.* v. *Burdick,* 94 Ga., 775; 21 S. E. Rep., 995.

Said Lumpkin, J.: " This was an interstate shipment, and, therefore, must be governed by the Interstate Commerce Act. The act prohibits not only contracting for, but also collecting a less rate of freight on such shipments than that specified in the schedule of rates in force at the time; and the act requires that such schedule shall be printed and kept in every station for inspection and use by the public."

To the same effect see *Chicago & R. I. P. R. R.* v. *Hubble,* 54 Kas., 232; 38 Pac., 266.

The case of *Indianapolis, Decatur & Springfield R. R.* v. *Erwin et al.,* cited above and referred to in 27 Am. & Eng. R. R. cases, page 8, is on all fours with that at bar.

The Illinois statutes are substantially the same as the Interstate Commerce Act, and in the opinion rendered thereon the

case of *Messenger* v. *Penn. R. R. Co.*, *supra*, was cited with approval the doctrine therein announced reiterated. The court said: "As the matter stands, the plaintiffs have paid their regular rates, and have been treated alike with other shippers not having had any undue advantage. To enforce such a contract as above, and adjudge defendant to pay the rebates claimed, would be to compel defendant to make an unjust discrimination in favor of plaintiffs, and to require the company to do what the statute forbids them doing. Such a result the law will not aid in accomplishing."

This opinion also effectually disposes of the case of *Toledo & C. R. R. Co.*, v. *Elliott*, 76 Ill., 67, by declaring that it was erroneously decided under a statute which had passed out of existence when the case was tried, and by expressly repudiating the doctrines there announced.

In *Bullard* v. *North Pacific R. R. Co.*, supreme court of Montana, 1890, 11 L. R. A., 246, it was decided that the passage of the Interstate Commerce Acts invalidated and rendered illegal all contracts for rebates or special rates entered into before its passage. In this case the contract was singularly like the one at bar.

If this contract is void in part, it is void *in toto*. *Cotten* v. *McKenzie*, 57 Miss., 418; *Lemonius* v. *Mayer*, 71 Miss., 514, s.c., 14 South., 33.

"As a general rule, where a promise is made for one entire consideration, a part of which is fraudulent, immoral, or unlawful, and there has been no apportionment made or means of apportionment furnished by the parties themselves, it is well settled that no action will lie upon the premises. If the bad part of the consideration is not severable from the good, the whole promise fails." 2 Beach on Contracts, § 1421.

"Where an indivisble promise is founded upon two considerations, one of which is legal and the other illegal, the promise cannot be enforced. So where a surety executes an indemnity bond to a sheriff, the sheriff agreeing to pay the proceeds of

the execution to the surety, to be held as security against liability on the bond, neither the principal nor any one authorized by him signing such instrument, the surety cannot be held upon the bond. Where a sale was made of fifteen tons of guano in entire contract and a note given therefor, if any of the bags of guano in the fifteen tons had not been branded and tagged according to law, the consideration of the note was illegal in part, and the whole promise failed. The contract could not be severed so as to authorize a recovery for that portion of the guano which had been branded. Where a contract contains illegal stipulations, and to sustain it in part would be practically to sustain it altogether, the court will treat it as wholly void." 2 Beach, *supra,* 1422.

" And the fact that an illegal contract may have been executed by one party furnishes no reason why the other should be compelled to execute his part of it remaining executory." *Id.,* § 1423.

" The illegality of an agreement for the formation of an unlawful trust affects the whole contract, and equity will leave the parties to it where it finds them, whether it is wholly or only partly executed. If the scheme of the trusts fail through illegality of the law, will not imply some valid agreement between the trustees and one who has become a participant in the unlawful plans which a court of equity will enforce in his favor, since the vice of illegality follows the parties through their subsequent dealings." *Id.,* § 1424.

" In an action to recover the portion of the expense agreed to be paid by the defendant to promote the election of such candidates for office as should be recommended by a reform association to which he belonged, it was held that the contract and expense were in violation of a statute relating thereto, and the complaint was properly dismissed, and that the fact that a sum greater than a portion set down to defendant had been paid for purposes permitted by the statute did not authorize a recovery, as the agreement was entire, and the lawful considera-

tion could not be separated from the portion of the contract which was illegal." *Id.,* § 1425.

Sir William Grant, Master of the Rolls, in *Thomson* v. *Thomson,* 7 Ves., 470, said: "You have no claim on this money except through the medium of an illegal agreement; which, according to the determination, you cannot support. . . . Here you cannot stir a step, but through that illegal agreement; and it is impossible for the court to enforce it. I must, therefore, dismiss the bill. Assuming, as the plaintiff argues, that we could view this agreement, as, in a sense, executory; because some years remain of the period it was to cover, how is the question effected? The purpose of the agreement was effected when the combination and control of the various lead interests were secured through its execution. But it was not executory. The plan contemplated was carried out, and a combination of the several concerns interested in manufacturing and dealing in lead products was perfected. It is, indeed, alleged in the complaint that the business was carried on by the trustees, and that they accumulated moneys and property for which they should have accounted. No act remained to be done by the parties to the agreement to make it in force. As an executed agreement it was open to others to come in under its terms. Even if the agreement were to be regarded as but partially performed, it would not help out the plaintiff's cause of action. For the illegality tainted the whole contract, and therefore, the court would leave the parties where it found them."

Judge DANFORTH, speaking for the court, in *Foley* v. *Speir,* 100 N. Y., 552, used the following language: "The agreement proved is an entire and single one — to pay as part of the whole expenses a single sum. It must stand, if at all on the illegal as well as the legal consideration, for the good cannot be separated from the bad. If we could find distinct engagements for the separate items, those which are legal might be enforced; but that is not possible. Here is but one promise upon a consideration which is in part unlawful, both

by statute and as against good morals, and in *Tahlimer* v. *Binkerhopp* (20 Johns [N. Y.] 386), it is laid down as a fundamental rule that all contracts which have for their object anything repugnant to the general policy of the law, or contrary to provisions of the statute are void, and it is held as well in law as in equity, *ex turpi contractu actio non oritur.*"

And in 2 Beach; *supra,* § 1426, it is declared:

" A contract is wholly void if covenants in restraint of trade, which are illegal as against public policy, enter into and form a part of the entire consideration, and both parties are in fault as to these covenants. *A separation of the good consideration from that which is illegal will be attempted in those cases only where the party seeking to enforce the contract is not a wrong-doer,* or the denial of relief would benefit the guilty party at the expense of the innocent."

The whole subject of illegal contracts is admirably treated and the cases digested in 15 Am. & Eng. Ency. of Law (2d ed.), 988 to 1016, to which the court's attention is invited.

As above suggested the clause in this contract assailed as being violative of law is indivisible and it is impossible for the court to enforce any part of it if it offends aganst any provision of any law. The idea that the illegality can be saved by refusing to apply it to cases where it violates the law is wholly unsound, where the language is broad enough to cover all cases.

*Howe, Spencer & Cocke* and *Catchings & Catchings,* for appellee.

Under the construction of the contract upon which this suit is based, and of the appellee's declaration announced by this court in its opinion delivered on the former appeal all questions involved in the pleadings, except those growing out of the first and second pleas, filed by appellant after the case was remanded, have been, we submit, to all intents and purposes adjudicated in favor of appellee.

To plea No. 4, filed by the appellant, the appellee interposed both a general and special demurrer. This plea avers that when the contract was made, and afterwards, until this suit was instituted, appellant had caused to be printed and kept open to public inspection, schedules showing its rates and charges; that these schedules had been printed and posted in its station houses; that no notice of any kind of a reduction of its published rates was given by the appellant before entering into the contract, or afterwards; that the rates specified in the contract are less than those specified in the published schedules; and that for this reason the contract was in violation of the Interstate Commerce Act. The special demurrer to this plea objects to it as follows:

First: Because it does not show that the appellant could not lawfully have amended its schedules so that they should include the rates specified in the contract. Under the Interstate Commerce Act, the Interstate Commerce Commission has no control whatever of rates filed with it. It has no power either to approve or disapprove rates filed with it. A railroad company must file its rates with that commission, and the commission must place and preserve them in its office. Thereafter such rates so filed must be observed unless the railroad company, by giving three days' notice should alter them. Upon giving three days' notice, it may file with the commission amendments to its schedules, or it may file entirely new schedules, and such amendments or such new schedules thereafter become obligatory in place of the schedules first filed. It is, therefore, evident that it was entirely within the power of the appellant to file with the Interstate Commerce Commission such amended tariffs as would include the rates fixed by the contract sued on, and if it did not do so, it stands on its own wrong, and cannot interpose its failure to do what it had the power to do, and what was its duty to do, as a justification in an action for damages for breach of the contract.

The second objection to the plea, pointed out by the special

demurrer, is included in the first, inasmuch as it avers that the appellant could lawfully have amended its schedules on file with the Interstate Commerce Commission, so as to make them include the rates fixed by the contract so that it could lawfully have performed all of the obligations of the contract.

The third objection pointed out by the special demurrer is that this plea does not show that the schedules which it sets up as having been in force at the date of the execution of the contract, had been filed with the Interstate Commerce Commission, as required by § 6 of the Interstate Commerce Act. This court will take judicial notice of the fact that appellant's road is wholly within the limits of the state of Mississippi and could not therefore have any Interstate rates other than " joint rates " with other carriers. The Interstate Commerce Act in force at the time did not require the making of joint rates but prescribed that when made they should be filed with the commission and be given such publication as should be directed by that body. The obligation imposed by the Interstate Commerce Act upon railroad companies, to observe their schedules of joint tariffs applies only to such schedules as have been *filed* with the Interstate Commerce Commission. Until they have been *filed* railroads can alter them at pleasure. The plea is therefore fatally defective in setting up that appellant cannot observe the obligations of the contract for the reason that the Interstate rates agreed upon by the contract were less than those contained in its *published* schedules. *Publication* of the joint schedules is one thing and *filing* these schedules with the Interstate Commerce Commission is quite another thing. Indeed the publication cannot be made until the rates have been filed and the commission has prescribed the manner of publication. It is the *filing* with the Interstate Commerce Commission of its schedules and the subsequent *publication* of them in such manner as the commission may prescribe, which makes it the duty of railroad companies thereafter to observe such schedules. Publishing joint sched-

ules without having first filed them with the Interstate Commerce Commission, is not a compliance with the duty imposed upon railroad companies by the Interstate Commerce Act. The railroad company is only bound by its joint schedules when they have been *both* filed and published. *Ry. Co.* v. *Horne,* 106 Tenn., 73; *Ry. Co.* v. *Leatherwood,* 69 S. W., 118.

The fourth objection pointed out by the special demurrer is that the plea does not show that the schedules alleged by it to have been in force at the date when the mill of the appellant had been constructed and the appellee had entered upon the discharge of its obligations under the contract had been filed with the Interstate Commerce Commission.

Plea Number 7, filed by the appellant, sets up that by the terms of the contract the appellant agreed to deliver, at New Orleans rates, all machinery, materials and supplies used in the construction of the cotton mills of the appellee as first built, or future additions thereto of main buildings, or additional machinery that increases the capacity of the plant, when shipped from points north or east of Birmingham; and in case coal should be required by the appellee, and provided they wish to ship the same by the N. O. & N. E. R. R. Co. to Laurel, the charges for the switching from the railroad of appellant to the mills of appellee shall not exceed $2.50 per car. The plea sets up that when the contract was made it had printed and open for public inspection, and had filed with the Interstate Commerce Commission, a schedule of tariffs, and that the tariff of charges mentioned in the contract was a variation from the tariffs so promulgated and filed, and that for that reason the contract was void. To this plea the appellee filed both a general and special demurrer. Through inadvertence and by reason of the confusion incident to the multitude of pleas, replications and demurrers, the special demurrer to this plea is not properly applicable thereto, and does not accurately allege the reasons of its insufficiency. Under the general demurrer, how-

ever, these objections can be urged, and briefly stated, they are as follows:

As we have already pointed out the consideration of the contract was the future building of the cotton mills, and it was not intended to and could not in fact go into operation or take effect until the completion of the cotton mills. This is apparent from the face of the contract and of the declaration. This being so, as we have already pointed out, an interval necessarily ensued between the making of the contract and the time when the shipments could be tendered thereunder, or, in other words, when the rates contracted for could be demanded and given. In this interval appellant could have filed with the Interstate Commerce Commission and with the State Railroad Commission a schedule of charges showing the rates contracted for in the contract in question.

This plea does not allege that at the time of the completion of the cotton mills, or at any time thereafter, appellant had " duly printed and kept open for public inspection and had filed with the Interstate Commerce Commission a schedule and tariff of charges at which it would and did transport property and freight, etc.," but simply avers that prior to and at the time of making the said contract it had printed and kept open for inspection, and had filed such schedule and tariff of charges. It must, we submit, be apparent to anyone, that is is no answer to the declaration.

The Interstate Commerce Act does not render invalid a contract to give certain rates at a future time because different rates are on file at the date of the contract. It only prohibits the giving of rates different from those which are published and filed at the time these different rates are given. There is nothing whatever alleged in this plea which is inconsistent with a scrupulous regard for and compliance with the Interstate Commerce Act, and this being so, the plea is, of course, bad.

The appellant could have altered its tariff schedules filed

with the Interstate Commerce Commission if any were so filed, whenever it saw proper to do so.    That commission is bound to receive and file all tariff schedules or amendments thereto, which a railroad company may choose to file.    If the tariff of charges contemplated in the contract sued on were a deviation from appellant's tariff schedules on file with the Interstate Commerce Commission, it was entirely within the power of appellant, long before the mills of appellee were built and before the rates fixed by the contract were to become effective, to so alter the schedules on file with the commission as to make it lawful for appellant to charge the rates fixed in the contract sued on.    Such alteration could have been made on three days' notice.    If appellant failed to make such alteration, it was a wilful default, and it has wilfully failed and refused to do what was its duty to do in order to enable it to perform its contract.    The plea rests upon an entire misconception in assuming that a contract to take effect in the future which stipulates for tariff charges different from those on file at the time the contract is made is void as being a violation of law.

The charter of appellant is such that it is not obliged to obtain the consent of the State Railroad Commission to its tariff of charges, or to any amendments which it might make thereto; so long as they are within the maximum fixed by the charter, the appellant is independent of the State Railroad Commission.    Of course the right conferred by its charter, to fix rates within a maximum limit, did not invest the appellant with the right to make discriminations.    While it might have charged anything it pleased under the maximum, still, the common law rule, to say nothing of our statute against discriminations, would require that in fixing its charges within the maximum they should contain no discriminations.    As said by this court in the case hereinbefore referred to, the appellant was only required to file its tariffs with the State Railroad Commission so that it might ascertain whether or not they contained discriminations.

The ninth plea filed by the appellant sets up generally that the *contract* sued on is an agreement, directly and indirectly, by a special rate rebate and drawback to charge and collect from the appellee less compensation than was charged or to be charged other persons for a like and contemporaneous service in the transportation of a like kind of traffic, under substantially similar circumstances and conditions. This plea is directly in the face of the express decision of this court to the contrary when this case was before it on the former appeal. We have hereinbefore quoted from the opinion of this court then delivered, to the effect that the *contract* was not an agreement such as is set up in this plea.

The tenth plea sets up that the *contract* was and is an agreement to give to the appellee and to the town of Laurel, as to the transportation of cotton and cotton goods, an undue and unreasonable preference, in violation of the Interstate Commerce Act. This plea is also in direct opposition to the ruling of this court on the former appeal, in which it decided that the *contract* was not discriminatory in any sense whatsoever.

*General Observations.*— By reason of the multiplicity of pleadings and hair-splitting distinctions and variations between many of them, it was difficult, if not impossible, to state accurately and at large the objections to each, sought to be interposed by the various special demurrers, and for this reason we interposed a general demurrer to each plea, under which we now propose to make some general observations as to points which are common to nearly all of the pleas.

It will have been observed already that all of the pleas, except the first two and the last two, seek to defend the suit on the ground of the unenforcibility of the contract by reason either of the statutes of the state or of the United States. The general purpose of these statutes is the same. That is to say, first, to prevent unjust discriminations between places or individuals, and, second, to secure adherence to the rates which have been filed and published as required by law.

All of the pleas which seek to present the defense of unjust discriminations are fatally defective in that they do not allege that any other person or corporation on appellant's line of railroad is so similarly situated with appellee that he or it occupies " a substantially similar circumstance or condition," within the meaning of the law.

On the former appeal this court distinctly held that the intent and purpose of the state and federal statutes in this particular are the same.

It is perfectly manifest that under this construction of the statutes in controversy they have no application unless it is shown that *unjust* discrimination has been made.

The various pleas of defendant merely assert that the rates contracted for were rates, rebates and concessions which were not open to the public at large, or to any other shipper along the line of the railroad of defendant, but were special and unlawful rebates and concessions, etc.   They are fatally defective in that they utterly fail to allege an *unjust* discrimination as defined by this court in the portions of its opinion above quoted.

All of the pleas which seek to avoid the contract rates by reason of their alleged deviation from the schedule of rates filed or published in accordance with the state and federal laws, are defective in that they do not allege that the tariff of freight charges which had been so filed or published, included freight charges on manufactured cotton goods from the town of Laurel to the various points shown by the bill of particulars to the declaration, to which shipments have been made.

It is not sufficient, we submit, to aver as a mere conclusion of the pleader, " that the rates specified in said contract constitute a reduction from said tariff of charges in favor of said Laurel Cotton Mills, that such change or deviation from said approved tariff was not first allowed by said railroad commission, and that the same was and is in violation of

§ 4292 of the Annotated Code of Miss., of 1892." It may well be that the general tariff of freight charges which was filed with the commission did not contain any reference to manufactured cotton goods to be shipped to the points indicated in the bill of particulars. Whether or not the contract rates constituted a deviation from the published rates is a mixed question of law and fact, and the facts necessary for its elucidation should have been specially pleaded.

The pleas which seek to avail of those provisions of the Interstate Commerce Act which require the filing and publication of freight schedules, and prohibit a deviation therefrom are fatally defective in another particular. This court must take judicial notice of the fact that appellant's road lies wholly within the limits of the state of Mississippi, and that it cannot, therefore, of itself and by itself, make any rates which are within the purview of the Interstate Commerce Act. In other words, any interstate rates which it may have, must necessarily be joint rates entered into by and between it and some other carrier. The allegation in these pleas that it is engaged in interstate commerce, does not necessarily involve the idea that it has interstate rates for the reason that it may transport commodities to either of its termini and there deliver them to connecting carriers who, in turn, transport them to other states, and may do this without making any joint rate with these other carriers. It would thus be engaged in interstate commerce without having interstate rates.

Under the Interstate Commerce Act which was in force at the time of the shipments here in controversy, no carrier was required or could be required by the commission as can be done under the recent amendment to the law to make joint rates with other carriers, but it was expressly provided that when such rates should be made they should be filed with the Interstate Commerce Commisson, and when so filed should be "made public by such common carriers when directed by said commission, in so far as may, in the judgment of the com-

mission, be deemed practicable; and said commission shall, from time to time, prescribe the measure of publicity which shall be given to such rates, fares and charges, or to such of them as it may deem practicable for such common carrier to publish, and the places in which they shall be published." It is further provided that when the joint tariffs shall have been so filed, they shall not be deviated from, except as provided by the statute, and that " it shall be unlawful for any common carrier, party to any joint tariff, to charge, demand, collect or receive from any person or persons, a greater or less compensation for transportation of persons or property, or for any services in connection therewith, between any points as to which a joint rate, fare or charge is named thereon, that is specified in the schedule filed with the commission in force at the time." It necessarily follows that in order to avail of this portion of the Interstate Commerce Act, appellant must first show that it has established joint rates with other carriers, that these rates have been filed with the Interstate Commerce Commission, and that they have been given such publicity as was prescribed by the commission. None of these things are pleaded, and the pleas, therefore, are, we submit, incurably defective. They merely allege that the contract rates are different from those which were published, in a certain specified manner. It is not alleged that any rates have been filed with the Interstate Commerce Commission, and the only penalty imposed by law is for a deviation from the rates filed with this commission. Nothing is averred in any of these pleas which is inconsistent with a proper observance of the Interstate Commerce Act in this particular, for it may be that no joint rates were ever made. If they were made, there is no reason to believe that they were ever filed with the commission. If they were never filed with the commission it is not a violation of law to give different rates. We submit that there can be no doubt whatsoever of the insufficiency of these pleas.

It will also have been observed that appellant interposed

several pleas, which at best only assert the partial illegality or unenforcibility of the contract, in bar of the whole contract. Thus it claims that if the provision in regard to giving the New Orleans rates on coal and machinery is illegal, the whole contract must fail, and also that although the bill of particulars filed with the declaration shows that something like ninety-nine per cent of the shipments on which overcharges are claimed, were destined for points beyond the limits of the state of Mississippi, the whole contract is illegal if the provisions of the Mississippi statutes have been violated. We submit that the contract is separable, and that if these matters so pleaded are illegal, the balance of the contract is none-the-less enforcible. An inspection of the bill of particulars filed with the declaration will show that perhaps ninety-nine per cent of the shipments on which overcharges are claimed were destined for points out of the state of Mississippi, and therefore not within the purview of the Mississippi statutes. It would be a singular outcome if the unenforcibility of the contract as to these few shipments should be held to render it not binding as to the great mass of other independent and distinct transactions. And this we respectfully submit is not the law.

It should be remembered that, so far as the appellee is concerned, the consideration of the contract is unquestionably legal. This consideration was the building of the mill, and because of that consideration the defendant promised to give the freight rates in question. It would be a monstrous miscarriage of justice to hold that because a party to a contract cannot do everything he promised he shall not be obliged to do anything, and this, although he has received what seemed to him sufficient recompense for the performance of the whole contract. Being paid to do many separate and distinct things, he cannot complain if he is made to do only a part of them. The portion of his obligation from which he escapes is so much clear gain to him, and cannot furnish a pretext for relief from the balance.

This proposition is fully recognized by the authorities, which might be multiplied almost indefinitely.

In Story on Contracts, sec. 627, it is said: "When the consideration is legal and the acts to be performed by the contract are in part legal and in part illegal, it may be enforced as to the acts which are legal, if capable of separation from the illegal."

In *Beard* v. *Denis,* 6 Ind., 220, the court said: "Where the stipulations in a contract are divisible, and a part impose reasonable and a part unreasonable restraints, the courts will give effect to the former and not to the latter."

In Parsons on Contract, § 380, the author says: "A distinction must be taken between the cases in which the consideration is illegal in part, and those in which the promise, founded on the consideration, is illegal in part. If any part of a consideration is illegal, the whole promise is void, because public policy will not permit a party to enforce a promise which he has obtained by an illegal act, or an illegal promise, although he has connected with this act or promise another which is legal.

"But if one gives a good and valid consideration, and thereupon another promises to do two things — one legal and the other illegal — he shall be held to do that which is legal, unless the two are so mingled or bound together that they cannot be separated, in which case the whole promise is void."

This distinction is wholly overlooked by counsel for appellee, whose theory, that if the contract is illegal as to Mississippi shipments, it must be illegal as a whole, is avowedly founded upon the well recognized principle above laid down, that a partial illegality of consideration avoids the entire contract. The consideration rendered by the Laurel Mills was the building of the factory, which was, of course, legal beyond question, but appellee contends that because the promise founded upon this consideration may be partially illegal, the whole contract falls. It confounds the promise and the consideration.

If the appellant corporation, after entering into the contract, had refused to build the mill, and the appellant had sued for damages for breach of contract, the suit could have been successfully defended by showing that the contract was illegal as to the Mississippi shipments, for there would then have been a partial illegality of the consideration for appellant's promise. When the situation is reversed, however, and the Laurel Mills seek to enforce the contract the result is wholly different. For the consideration moving to the railroad is unquestionably legal, and it is only the promise founded thereon which is claimed to be partially illegal. The purpose of this action is to require the appellee to carry out its promise, and if it cannot do all that it agreed to do, it must do all that the law will permit. The Mississippi shipments and the interstate shipments are, if there are, legally speaking, any interstate shipments before the court, two separate things, and the contract rate can be applied to the one and not to the other without the slightest difficulty or confusion."

Argued orally by *Thomas A. McWillie,* for appellant, and by *Oliver W. Catchings,* for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

After the most careful and protracted examination of this record, we are satisfied that the demurrers, general and special, to the fourth and seventh pleas should have been overruled.

The seventh plea in terms avers that the schedule was " filed." We think the cases of *Texas R. Co. v. Abilene,* 204 U. S., 426; 27 Sup. Ct., 350; 51 L. Ed., 553, and *Texas R. Co. v. Cisco Oil Mill,* 204 U. S., 449; 27 Sup. Ct., 358; 51 L. Ed., 562, referred to by the learned counsel for the appellant, shed strong collateral light upon this inquiry, whilst not on exactly the same case on their facts. We are unable to see how any further relief can be granted the appellant under the former decision of this court in this case. The opinion of this court delivered

on the demurrer was very elaborate, exhaustive, and complete. It covered every phase of this case except the part of it which may be saved by the two pleas numbered 4 and 7, and it is the law of the case as to all other questions.

*Reversed and remanded.*