[No. 8356. Department One. June 2, 1910.]

SULTAN RAILWAY & TIMBER COMPANY, *Respondent*, v.
GREAT NORTHERN RAILWAY COMPANY,
*Appellant*.[1]

CARRIERS—GOODS—CONTRACTS—CONSIDERATION. Where a logging
company was insisting upon its right to cross a railway at grade,
which was objected to by the railway company, and the parties
entered into negotiations to adjust their respective rights, and by
mutual concessions reached an agreement in which all their differ-
ences were settled by the railway company's agreeing to carry logs
at a certain rate, the agreement was intended as, and had all the
essential elements of, a contract.

SAME—CONTRACTS—MUTUALITY. An agreement by a railway com-
pany, to carry at a certain rate, all of the logs that a logging com-
pany should tender for carriage, is not void for lack of mutuality,
where there was an independent consideration in that the logging
company forbore its right to cross the railway at grade, so long as
the rate was continued, although there was no agreement to ship
any quantity of logs.

SAME—CONTRACTS—CONSIDERATION—DISPUTED CLAIMS. A logging
company's forbearance of a right claimed by it to cross a railway
at grade constitutes a sufficient consideration for a contract by the
railway company to carry logs at a certain rate, whether the claim
for the grade crossing was well founded or not, where the parties
treated it as a right and contracted with reference to it.

SAME—CONTRACTS—CONSTRUCTION. A letter by a railway com-
pany to a logging company agreeing to carry "your" timber at a
certain rate, will be construed to refer not only to timber owned
by the logging company at the time, but to any tributary timber
which it might tender for carriage, where the same was under dis-
cussion at the time the negotiations were carried on between the
parties, and the logging company made known its purpose to acquire
such other timber.

SAME—DISCRIMINATION—CONTRACTS—VALIDITY. The law prohibit-
ing discrimination between shippers is not violated by a contract of
a railway company to carry the logs of a logging company between
certain points at a specified rate, where part of the consideration
therefor was the logging company's forbearance of the right to cross
the railway at grade; and such contract is not void as against public
policy.

[1]Reported in 109 Pac. 320, 1020.

SAME—DISCRIMINATION—STATUTES—CONSTRUCTION.   The railway commission law, Rem. & Bal. Code, § 8627 *et seq.*, prohibiting discrimination between shippers by common carriers, does not prevent a railway company from entering into a contract with a shipper to carry particular goods at a fixed rate for a given time, or to the amount of a given quantity.

SAME—EVIDENCE OF DISCRIMINATION.   The fact that a railway company's published tariff of rates is greater than the amount agreed upon between the railway and a logging company for the carriage of its logs is not conclusive evidence that the latter is discriminatory, where an independent consideration passed between the parties in addition to the rates charged.

SAME—DEGREE OF PROOF.   Where a railway company seeks to avoid a contract to carry goods on the ground that the same is void as against public policy, it must, as between itself and the carrier, establish the invalidity by direct evidence of the fact.

Appeal from a judgment of the superior court for King county, Ronald, J., entered June 28, 1909, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, in an action on contract.   Affirmed.

*F. V. Brown* and *Frederic G. Dorety*, for appellant.

*Benjamin S. Grosscup* and *William C. Morrow*, for respondent.

FULLERTON, J.—The respondent brought this action against the appellant to recover damages for a breach of contract.   The action was tried in the court below by the judge sitting without a jury, and resulted in a recovery by the respondent.   This appeal was taken therefrom.

The facts material to an understanding of the controversy are, in substance, these:   The appellant is a common carrier of both intrastate and interstate commerce.   The respondent is engaged in the business of logging.   For sometime prior to the month of April, 1903, the respondent had logged in the vicinity of what is now Sultan Junction.   At that date it owned a considerable body of timber in that vicinity, the logs from which it was marketing by bringing them down

on skid roads to the Skykomish river from whence they were rafted to the city of Everett, where the principal market was found. The motive power used to drag the logs along the skid road was furnished by stationary donkey engines. After the logs were brought to the skid road from the place where they were cut, the nearest donkey engine would send out its cable and drag them along until they could be reached by the cable of the next engine, which in turn would drag them to the next one, and so on until they reached the dumping grounds on the bank of the river. As the timber was logged off, the line of haul lengthened, requiring the 'repeated installation of additional donkey engines, as the distance that could be covered by one ranged from but one-half to three-quarters of a mile.

In April, 1903, the respondent found it necessary to change its method of hauling, and conceived the idea of laying rails on its skid road and using a locomotive engine to haul its logs. Its skid road crossed the appellant's railway track at grade, and to make the required change, it was found to be necessary to cut the track at the place of crossing and put in the customary frogs and other protective devices usually found at railroad crossings. The respondent thereupon applied to the appellant for the privilege of putting in a crossing at grade, when it was informed by the railroad company that a grade crossing was inadvisable, and that the respondent must find a crossing either above or below grade. An over or under crossing was found not to be feasible, and various plans were suggested by the respondent to overcome the appellant's objection to a grade crossing, none of which proving acceptable, the respondent threatened to avail itself of the courts with the view of forcing a crossing. About this time the appellant's traffic manager approached the officer of the appellant and inquired what rate of carriage they would deem sufficiently attractive to induce them to discontinue hauling logs across the appellant's tracks, and to market them by way of the appel-

lant's road instead. Negotiations were thereupon taken up along this line, which were participated in by a number of the managing and traffic officials of the appellant's road, during the course of which the respondent informed them fully of its then timber holdings, of the timber on which it held contracts of purchase and of other timber tributary to that point of shipment which they expected to procure, as well as the additional cost and expense it would be put to in order to change its system of logging to make it fit the changed conditions; among which was the fact that it would have to lessen the grades and lengthen the curves on its existing road, and place thereon heavier rails and construct more substantial bridges than would be necessary were it to pursue the method of logging it originally had in view.

Particular inquiry seems to have been made by the railway officials as to the volume of traffic the railway might expect from that source, and they were told that it would take from fifteen to twenty years to finish logging the timber tributary to the railway at that point. The railway company finally proposed to haul the respondent's logs from Sultan Junction to Everett at a rate of $1 per thousand feet, board measure, with an estimated equivalent weight basis of twenty-five cents per ton, until a permanent weight basis could be arrived at by weighing the logs for the first few months of hauling. This proposition was accepted by the respondent, whereupon the appellant, through its assistant traffic manager, wrote the respondent's president the following letter:

"Seattle, Wash., April 26, 1904.
"Mr. U. K. Loose, President,
       "Sultan Railway & Timber Co.,
             "Snohomish, Washington.
"Dear Sir: Referring to the matter of hauling your timber from Sultan Junction to Snohomish, Everett, Union Slough and Marysville. The understanding reached between you, Mr. Ward and myself at the discussion we had in Mr. Ward's car on Friday, April 22nd, is, until a permanent weight basis can be arrived at by weighing the cars

for the next few months, that the logs shall be handled as follows:

"A charge of 25 cents per ton with a minimum of 50,000 lbs. per car, will be made; you to furnish certified copies of Official Scaler's report of logs hauled at the end of each month; and an adjustment of 'over or under' charges will be made so that the charge to you for hauling will not exceed $1.00 per thousand feet official scale with a minimum of 7,500 feet per car average for the month.

"A special switching charge of $3.75 per hour will be made where we are required to make more than one setting of cars; except that we will give one hour's time of the switch engine in spotting cars at your unloading works.

"You are to take empties and deliver loads at convenient transfer tracks at Sultan Junction, and will keep the tracks, necessary for our engine to use, in such repair as to enable our trains to run over them with perfect safety.

"We will furnish bunks and attach same to cars assigned to your exclusive service; but in the event that cars are taken out of service on account of suspension of operations they are to be re-bunked by you; or, you will accept this company's bill for same.

"Cars used in your service will be subject to the usual rules of the Car Service Association.

"You are to assume ordinary responsibilities assumed by railways interchanging cars as covered by rules of the American Railway Association.

"Your company to load and unload the logs and assume responsibilities for damage to cars in doing so.

"The instructions to cover our understanding of the terms under which your logs are to be hauled by contract were received from Mr. J. W. Blabon, our Fourth Vice President; and although Mr. Ward said that he did not care about a contract, it may be that Mr. Blabon will still wish to have one executed; in the meantime, however, I will issue instructions to our agents to handle the business as outlined above.   Yours truly,    Jno. C. Eden,

"Assistant General Traffic Manager."

The parties continued under the arrangement outlined in the letter until March 1, 1906, when a weight basis for charges at the rate of twenty-four cents per ton was agreed

upon in place of the charge based on board measure. Shipments were continued on the weight basis until June 29, 1907, when the appellant notified the respondent that the rate arranged for in the foregoing agreement would be canceled on August 31, 1907, and that thereafter the respondent would be required to pay for shipment of its logs between the points named at a rate of sixty cents per ton, or $2.50 per thousand feet board measure. Subsequent to the time the rate was agreed upon and prior to the time it received notice of the cancellation of the contract, the respondent expended in changes and extensions of its logging road the sum of sixty thousand dollars.

After the cancellation of the agreed rate, the railroad company published and posted and filed with the state railroad commission a rate or tariff sheet, showing a rate for logs between Sultan Junction and Everett of $2.50 per thousand feet, board measure, or its equivalent on a weight basis of sixty cents per ton. There is, however, no evidence in the record, further than the fact of the adoption of the published rate, tending to show what is a just and reasonable rate for the transportation of logs between the points named. . The respondent in its evidence did not touch on the question, and the railroad company offered no evidence on any of the matters in dispute, but accepted the evidence of the respondent's witnesses as true. After the adoption of the published rate, the respondent tendered to the appellant for shipment certain logs, cut, however, from timber purchased by the appellant subsequent to the time the contract was entered into, at the contract rate, tendering it at the same time the freight charges thereon at the rate of twenty-four cents per ton. The shipment was refused by the railway company at any less rate than the published rate. The respondent thereupon began this action, with the result as before stated.

The appellant's first contention, stated in the language of its learned counsel, is this:

"The parties to the transaction in question here never intended to assume binding obligations or do more than adopt a mutually satisfactory working arrangement which the self-interest of both parties would enforce. But, even had they desired to assume contractual obligations, they would have failed in this instance, because there was no mutuality, since there was no agreement by the logging company to ship any particular quantity of logs, and no other consideration was given for the contract, since the logging company's forbearance to force a grade crossing was not in accordance with any promise, but was at all times voluntary on their part, and was not obligatory upon them."

But as we view the record these contentions are not tenable. That there was a contract and an intent to contract we think there can be but little question. The situation then confronting the parties was one in which both had rights. The appellant, because of its vast passenger and freight traffic, had the right to insist that the respondent, if it crossed its tracks, do so in such manner as would reduce the hazard to its traffic to a minimum; while, on the other hand, it was not in a position to insist that its railway line constituted a barrier across which the respondent could not go without its permission. It was to adjust these respective rights that the parties entered into negotiations, and when they did negotiate, and by mutual concessions reached an agreement in which all of their differences were settled, such agreement had in it all the essential elements of a contract.

We think, also, that there was no want of mutuality in the contract. It will be observed from the quotation made from the argument of counsel that it is thought the lack of mutuality lies in the fact that the respondent did not agree to ship any particular quantity of logs, and that it did not give up but only forbore its right to force a crossing at grade across the appellant's tracks. This latter part of this

contention we do think accords with the facts. As we view the record the respondent, not only forbore its attempt to force a crossing at grade, but agreed to so forbear as long as the appellant was willing to carry its logs at the rate of twenty-five cents per ton between the points named in the agreement; and this being so, the railroad can plead the agreement and its willingness to haul at the agreed rate as a defense to any action brought by the respondent to force a crossing for a logging railway at grade.

Nor was there a want of mutuality because there was no agreement to ship any particular quantity of logs. The contract, as we view it, was one by which the appellant promised to carry between the points named all logs that the respondent should tender it for carriage, be the same much or little. Such a contract, when founded upon a consideration independent of the mere promise to pay the contract rate, is not void for want of mutuality. It is this fact—the fact that there was an independent consideration—that differentiates the case at bar from the cases cited and relied upon in the appellant's brief. For example, in *Dennis v. Slyfield*, 117 Fed. 474, it was said by Judge Lurton, who pronounced the opinion of the court, that the writing entered into obligated only one of the parties thereto; that while it obligated the owners of the vessel to carry all lumber which the dealers might from time to time during the season deliver for carriage, it did not obligate the opposite party to deliver any lumber for carriage, or to do more, even by implication, than pay the prices named for carrying the lumber. So with the case of *Railway Co. v. Bagley*, 60 Kan. 424, 56 Pac. 759. There the railway company agreed to carry corn between certain points at a certain price, but it did not obligate the other party to the contract to ship any corn, or do more than pay the contract price for such corn as he should ship. The same principle was involved in the cases of *Chicago and Great Eastern R. Co. v. Dane*, 43 N. Y. 240; *Louisville N. A. & C. R. Co. v. Flanagan*, 113 Ind. 488, 14 N. E. 370,

3 Am. St. 674, and the cases cited in Page on Contracts, § 307. The contracts in these cases were held not binding for want of mutuality, because the promisee gave up nothing as a consideration for the promise. But, as we have shown, the fact is different in the case at bar. Here the promisee paid a consideration for the promise. It agreed, among other things, to abandon its claimed right to cross the appellant's tracks at grade.

In this connection, however, the appellant makes the contention that the respondent had no legal right to cross its track with a private logging road, and that in consequence it gave up nothing when it surrendered such claim of right. The case of *Healy Lumber Co. v. Morris*, 33 Wash. 490, 74 Pac. 681, 99 Am. St. 964, 63 L. R. A. 820, is cited as sustaining this contention, but we cannot think the case conclusive of the question. It is true we did there hold that a logging company performing no public function was without power to condemn a way for a logging road, notwithstanding the legislature had purported to confer on it that power, but the question of the right of a logging company to condemn for such a way when the way was one of necessity was neither presented nor decided. The constitution (art. 1, sec. 16), grants the right to take private property for private ways of necessity, and it was open to the respondent to claim that the conditions then existing presented a sufficient cause for the exercise of the right. It is not necessary now that we inquire how well founded was this claim. It is enough that the parties themselves treated it as a right and contracted with reference to it.

By referring to the letter before set out, it will be noticed that the writer of the letter, when speaking of the timber to be hauled under the contract, refers to it as "your timber." It is argued by the appellant that this phrase limits the timber agreed to be shipped to the timber owned by the appellant at the time the contract was entered into, which amounted to some fifty million feet, and that, since this was

all shipped before the alleged breach on the part of the railway, the contract has been performed. We think, however, the evidence makes it clear that the contract to haul did not refer to timber then owned by the respondent, but to such timber tributary to the junction named as the respondent should tender for shipment. This is made clear by what took place at the meetings of the parties while the contract was being negotiated. It is shown that at those meetings the entire matter was gone into; that the respondent not only made known its then holdings, and its outstanding contracts of purchase, but also its purpose to acquire other timber properties and continue its logging business at this point as long as it found it profitable, or until the tributary timber should be exhausted. When, therefore, the railway official used the terms "your timber" in setting out the contract, he must be held to have meant the timber concerning which the parties were negotiating, and not the specific quantity then owned by the respondent.

The last contention is that the contract is void as against public policy. The appellant argues that because the law imposes upon it certain conditions—for example, prohibits it from discriminating in its charges or facilities for transportation between places or persons in the transportation of freight or passengers; prohibits it from receiving from any person, either directly or indirectly, a greater or less compensation for services rendered than it charges or receives from any other person for doing a like or contemporaneous service; requires that its passenger and freight tariffs shall be fair, just, reasonable and sufficient; that it shall furnish to the state railroad commission and keep at each station, depot and office for inspection of all interested persons during business hours a complete schedule of all rates, rules, orders, classifications or regulations put in force by it between all points in this state—it is without power to enter into a special contract with an individual to carry freight for any given time at a particular rate. This, on the prin-

ciple, apparently, that, since it must grant to all the privileges it grants to one, a rule holding its contracts with reference to freight and passenger tariffs perpetual might result when conditions change in grossly excessive tariff rates to the general public or grossly unremunerative and destructive rates to the railroad company itself.

The acts of the legislature of this state establishing a railroad commission and providing for the regulation of freights and fares will be found in the statutes of 1905, p. 145, Laws 1907, p. 536, and Laws 1909, p. 191 (Rem. & Bal. Code, § 8627 *et seq.*). The acts are too long even to epitomize here, but it will be found upon examination that they do not in terms prohibit a railway company, except in certain specified cases, from changing or altering its tariff rates at any time it deems the reason sufficient, nor from entering into a contract with an individual shipper to carry particular goods at a fixed rate for a given time or to the amount of a given quantity. The prohibition is against discriminations, against the hauling of one man's goods at a more favorable rate than it will haul another's and against extortionate and unreasonable charges, but it does not purport to prohibit the railway company from giving a shipper a binding assurance that tariff rates on a given commodity will not be changed before the end of a fixed period, or before a given commodity has been shipped. The effect of the statute in this respect is similar to that of the interstate commerce act concerning which the supreme court of the United States in *Cincinnati etc. R. Co. v. Interstate Commerce Commission*, 162 U. S. 184, said:

"Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at the common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the neces-

sities of commerce, and generally to manage their important interests upon the same principles which are regarded as sound, and adopted in other trades and pursuits."

It is true that in a certain sense there are three parties to contracts of this nature, the carrier, the shipper, and the state. The interest of the first two is at once apparent; that of the latter consists in seeing that the contract is not discriminatory or oppressive on the shipper, or so far improvident on the part of the carrier as to impoverish it and thus prevent it from performing its functions as a carrier. But subject to these requirements we see no reason why the railway company may not now contract for the carriage of freights as freely as it was wont to do before the passage of the commission acts. The record fails to show that the contract in question is in any manner discriminatory or extortionate, or that it is unduly oppressive on the carrier. As we have said elsewhere, the record is silent on these matters, other than it was shown that the company had established a public rate between these points considerably higher than the contract rate. But this is not sufficient to justify the court in setting aside the contract rate on the ground of its inadequacy. While in a contract between the carrier and a member of the general public over the reasonableness of a freight charge it would be some evidence of the justness of the charge, conclusive perhaps in the absence of any other showing, to show that the rate exacted was the published rate and the rate charged every one for a similar service, it is not evidence when the purpose is to set aside a rate created by contract. As between the carrier and the other party to the contract the carrier must establish its claim of invalidity by direct evidence of the fact.

It is unnecessary in this proceeding that we consider the effect of the contract on rates to be charged to other shippers desiring to ship between the same points. Since the railway company is forbidden to discriminate in its charges between shippers, it could not, of course, charge other shippers a

greater rate than the contract rate for a like or similar service. But this does not necessarily mean that the rate charged must be the contract rate. It will be remembered the respondent, as an inducement to the contract, surrendered a right, and it may be that the value of the surrendered right can be taken into consideration in fixing the public rate, but this question we expressly refuse to decide.

Of the cases consulted we will specially refer to one only, namely, the case of *Alabama etc. R. Co. v. Mississippi Railroad Commission*, 203 U. S. 496. This case arose in Mississippi and the opinion of the state court is found in *Alabama etc. R. Co. v. Mississippi Railroad Commission*, 86 Miss. 667, 38 South. 356. The facts were these: The plaintiff railway company made what is called a "rebilling rate" of $3\frac{1}{2}$ cents per 100 pounds on grain and grain products shipped from Vicksburg to Meridian, applicable, however, only to shipments into Vicksburg over a single road. Instead of being enforced solely as a rebilling rate, the Vicksburg merchant who received a carload of grain or grain products over the indicated road was permitted to either forward it over the plaintiff's road to Meridian or, at any time within ninety days in lieu thereof, send a similar carload, no matter whence received, from Vicksburg to Meridian at the same rate. The railroad commission of Mississippi, on complaint being made, entered an order declaring that all grain products shipped between these points should be carried at the rate of $3\frac{1}{2}$ cents per 100 pounds. The railway appealed to the courts, complaining of the order on various grounds, among which was the ground that the rate fixed was unreasonable, because being below the actual cost of service. The supreme court of Mississippi affirmed the order, holding that the railroad company could not be heard to make the plea. This judgment was affirmed in the supreme court of the United States, the court saying:

"The order of the commission merely meant this: If a Vicksburg merchant who received a carload of grain over the

Shreveport road was permitted by the railway company to ship over the Vicksburg road to Meridian any other carload at 3½ cents per 100 pounds, every other merchant in Vicksburg should be permitted to ship at the same rate, although he had had no dealings with the Shreveport company. It is unnecessary to inquire whether the order could be sustained if it appeared that the plaintiff received only 3½ cents as its share of a total rate on through shipments to Meridian from the Northwest by the Shreveport road; for here, under the guise of a rebilling rate, the Vicksburg merchant who dealt with this Western road was given a rate of 3½ per cent on any grain that he might see fit to ship to Meridian. While it may be true that a local railway's share of an interstate rate may not be a legitimate basis upon which a state railroad commission can establish and enforce a purely local rate, yet whenever, under the guise or pretense of a rebilling rate, some merchants are given a low local rate the commission is justified in making that rate the rate for all. It is not bound to inquire whether it furnishes adequate return to the railway company, for the state may insist upon equality, to be enforced under the same conditions against all who perform a public or quasi-public service. When voluntarily the Vicksburg company established a local rate of 3½ per cent from Vicksburg to Meridian for those who had within 90 days made a shipment over the Shreveport road, it estopped itself from complaining of an order making that rate applicable to all shipments, no matter whence they arose, and in favor of all merchants, whether those transporting over the Shreveport road or not.

"We are not unaware of our decision in *Texas & Pacific Railway v. Interstate Commerce Commission*, 162 U. S. 197, in which, on review of the interstate commerce act, we held that a mere inequality of rate was not always proof of undue discrimination, but we were passing upon an act of Congress and seeking to ascertain its intent and scope. There was no intimation that it was not within the power of Congress to prescribe an absolute equality of rate. In the present case we are not construing an act of the state of Mississippi or passing upon the powers which by it are given to the state railroad commission. Those matters are settled by the decision of the supreme court of the state, and the question we have to consider is the power of the state to

enforce an equality of local rates as between all parties shipping for the same distance over the same road. That a state has such power cannot be doubted, and it cannot be thwarted by any action of a railroad company which does not involve an actual interstate shipment, although done with a view of promoting the business interests of the company. Even if a state may not compel a railroad company to do business at a loss and conceding that a railroad company may insist, as against the power of the state, upon the right to establish such rates as will afford reasonable compensation for the services rendered, yet when it voluntarily establishes local rates for some shippers it cannot resist the power of the state to enforce the same rates for all. The state may insist upon equality as between all its citizens, and that equality cannot be defeated in respect to any local shipments by arrangements made with or to favor outside companies."

See, also, *Laurel Cotton Mills v. Gulf etc. R. Co.*, 84 Miss. 339, 37 South. 134, 66 L. R. A. 453; *Gulf etc. R. Co. v. Laurel Cotton Mills*, 91 Miss. 166, 45 South. 982.

We hold, therefore, that the contract is valid and binding upon the parties thereto, that it violates no principle of public policy and is capable of being enforced. It follows that the judgment appealed from must stand affirmed, and it is so ordered.

RUDKIN, C. J., GOSE, and MORRIS, JJ., concur.

CHADWICK, J., concurs in the result.

ON PETITION FOR REHEARING.

[*En Banc.* July 18, 1910.]

RUDKIN, C. J.—A petition for a hearing *en banc* has been filed in this case, in which the appellant earnestly insists that our former opinion is in direct conflict with the decision of the supreme court of the United States in the case of *Armour Packing Co. v. United States*, 209 U. S. 56. It seems to us, however, that this case is readily distinguishable from the case cited, on two grounds: First, because there was here a consideration for the contract, in addition to and independent

of the freight rate agreed upon, so that the rate is not necessarily discriminatory; and second, because the contract was entered into before the passage of the railroad commission act and the amendments thereto, and there is nothing in the latter acts tending to show that the legislature intended to abrogate previously existing valid contracts, conceding that it had the constitutional power to do so.

The petition is therefore denied.

FULLERTON, CHADWICK, GOSE, DUNBAR, CROW, and PARKER, JJ., concur.