## UNITED STATES v. HARRIS.

### In re CHINOOK LUMBER & MFG. CO.
### No. 8816.

Circuit Court of Appeals, Ninth Circuit.
Dec. 5, 1938.

Sam. M. Driver, U. S. Atty., of Spokane, Wash., William D. Donnelly, Oscar A. Provost, and Thomas E. Harris, Attys., Dept. of Justice, all of Washington, D. C., and Charles E. Collett, Acting Asst. Atty. Gen., for the United States.

Harry T. Davenport, of Spokane, Wash., for appellee.

Jas. A. Williams and Clarence C. Dill, both of Spokane, Wash., for amici curiæ.

Before HANEY, STEPHENS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The United States appeals from an order of the District Court confirming a referee's order allowing in part and rejecting in part a claim in bankruptcy filed by the Government. The claim grew out of a

breach by the bankrupt of a contract for the purchase of timber on the Colville Indian Reservation. The questions presented relate to the construction of the contract and the measure of damages to be applied.

The contract, entered into in 1924, was originally between the Superintendent of the Colville Indian School and the Hedlund Box and Lumber Company. It was assigned by the latter in 1925 to the Hedlund Lumber and Manufacturing Company, which afterwards changed its name to Chinook Lumber and Manufacturing Company. The latter company—the bankrupt here—will be referred to as the purchaser.

The contract is, in part, as follows:

"The Superintendent, in consideration of the agreements by the purchaser, agrees to sell to the purchaser upon the terms and conditions herein stated and the General Timber Sale Regulations approved April 10, 1920, by the Assistant Secretary of the Interior and which are hereto attached and made a part of this contract, all the merchantable dead timber, standing or fallen, and all the merchantable live timber marked or otherwise designated by the officer in charge for selective logging as required by the attached General Timber Sale Regulations, comprising trees approximately fourteen inches and larger in diameter at a point four and one-half feet from the ground, estimated to be 129,840,000 feet of yellow pine and 102,350,000 feet of Douglas fir and larch on unallotted land within a tract having a total estimated stand of 217,280,000 feet of yellow pine (including so-called "bull-pine"), and 119,-840,000 feet of Douglas fir and larch, board measure, all located on allotted and unallotted lands within a tract of about 121,045 acres known as the "Twin Lakes Logging Unit," lying in the northeast portion of the Colville Indian Reservation and described as follows: [Then follows a metes and bounds description of the area].

"Excepting such areas now open to entry as may be disposed of by the General Land Office under the homestead acts, patented lands and bona fide mining claims, and areas so rugged and inaccessible that the Commissioner of Indian Affairs shall consider logging thereon to be impracticable or shall reserve all timber for forest and water protection purposes.

"One hundred and four million nine hundred and thirty thousand feet of this timber is on an area of 42,209 acres of allotted land and the Superintendent authorizes the purchaser to enter into separate contracts with Indians holding trust-patented allotments within the limits of the area above defined for the purchase of their timber, subject to Indian Service Regulations, and according to the terms of this General Contract and the General Timber Sale Regulations.

"For and in consideration of the agreements by the Superintendent, the purchaser agrees that prior to March 31, 1944, he will cut and remove all the timber covered by this contract, and will pay to the Special Disbursing Agent for the use and benefit of the Colville tribe of Indians, the full value of the timber, as shall be determined by the actual scale of the timber at fixed rates per thousand feet, board measure, Scribner Decimal C Log Scale, which rates for specified periods of the contract shall be as follows:

"(a) For the first period of the contract which ends March 31, 1929:

"1. For yellow pine three dollars and ten cents.

"2. For Douglas fir, larch, and other species one dollar and two cents.

"(b) For the three-year period of the contract beginning April 1, 1929, the original stumpage prices plus twelve per cent (12%) thereof, or

"1. For yellow pine three dollars and forty-seven cents.

"2. For Douglas fir, larch, and other species one dollar and fourteen cents.

"(c) For the three-year period of the contract beginning April 1, 1932, the prices paid during the preceding three-year period plus twelve per cent (12%) thereof, or

"1. For yellow pine three dollars and eighty-nine cents.

"2. For Douglas fir, larch, and other species one dollar and twenty-eight cents."

There then follows a provision that the Commissioner of Indian Affairs shall readjust upward the prices for each of the periods beginning April 1, 1935, April 1, 1938, and April 1, 1941, but that in no event shall the rate of increase for any of these periods be less than 6% or more than 18% above the prices for the period immediately preceding.

The purchaser agreed, within two months, to enter into separate contracts with such Indians holding trust-patented allotments as might desire to sell their timber, at the prices stipulated for unallotted

timber and subject to the same provisions as under the general contract. Certain advance payments and deposits were required under both the general and separate contracts. The purchaser undertook to cut and remove "from some portion of the sale area, including allotments," at least 10,000,000 feet prior to March 31, 1927, and not less than 20,000,000 feet during each twelve months thereafter "until the contract is completed."

There was a provision relating to the obligation of the purchaser in respect of the prompt logging of merchantable timber which might be injured by fire. The nature of this latter stipulation will be indicated in greater detail elsewhere in the opinion.

The applicable provisions of the General Timber Sale Regulations, attached to and made a part of the contract, will be quoted or summarized later.

Several extensions of time within which to commence cutting were granted the purchaser because of right of way and other initial difficulties; and it was not until August, 1928, that cutting actually began. For the purpose of removing the timber the purchaser had meanwhile built a railroad twelve to fifteen miles long at a cost of about $750,000. Operations under the contract appear to have been carried on for a period of a little more than two years, during which time the purchaser logged off and paid for some twelve and one-half million feet of pine and fir. In August, 1930, about eleven million feet of the standing timber were damaged by fire, and this the purchaser refused to log off for the reason that prevailing market conditions made it impossible to do so without incurring loss.

Commencing with November 1, 1930, and continuing at intervals through the winter, an exchange of letters took place between the purchaser and the Government. The former urged that a lower price scale than stipulated be put into effect, saying that if it were forced to live up to the contract an entire suspension of operations would necessarily ensue. Pointing to the current business situation and the condition of the lumber market, it declared that these made it impossible for it to continue with the existing engagement. The inescapable conclusion from these exchanges is that the lumber company declined to remedy existing defaults or to perform further.

By letter dated April 1, 1931, the Commissioner of Indian Affairs formally notified the purchaser that the Department had "canceled" the contract under date of March 26, 1931, and that demand was being made upon the Maryland Casualty Company (which had furnished a $40,000 performance bond on behalf of the purchaser) for the payment of the full penalty of the bond. On June 5, 1931, the purchaser, on its own petition, was adjudged a bankrupt; and in due course appellee was appointed trustee. Thereafter the United States presented its claim growing out of the bankrupt's default. Two amounts were set up, one for the asserted depreciation in market value of the timber remaining uncut, the other for the loss occasioned by the failure of the bankrupt promptly to log the burn. Formal notification was given of a prior claim to the assets of the bankrupt, pursuant to § 3466 of the Revised Statutes, 31 U.S.C.A. § 191.

After a delay of several years there was a hearing before the referee for the liquidation of the Government's claim. The trustee filed objections to its allowance on a number of grounds, not necessary to be enumerated here.

The referee concluded that the contract was enforceable and that there had been an anticipatory breach entitling the Government to rescind or sue for damages. He found that the Government's use of the word "canceled" in its letter terminating the contract was not to be taken as indicative of an intent to rescind, and that there had been no waiver of the right to damages. Without discussion of the latter point, still a subject of debate here, we may say at once that we regard it as having been correctly decided. Restatement of Contracts, § 410, Comment b; see, also, P. J. Carlin Const. Co. v. Guerini Stone Co., 1 Cir., 241 F. 545, 554; Moore v. Beiseker, 8 Cir., 147 F. 367, 378.

The referee was of the opinion that the measure of damages for failure of the bankrupt to complete its contract as to unburned timber was the difference between the contract price and the market value of the timber at the time when the contract should have been performed. Since it was thought impossible to foretell the market value of the timber so many years in advance, and since claimant had offered no proof in that respect and in the nature of things could not do so, the referee disal-

lowed the first item of the Government's claim, although permitting it to retain, as liquidated damages, certain advance payments which had been made. The claim growing out of the failure to log off the timber damaged by fire was allowed in part and rejected in part.

Upon review, the court affirmed the referee's order but expressed the opinion that, except as to the timber damaged by fire, the contract was void for uncertainty and for want of mutuality.

1. The holding that the contract was not mutually binding or that it was void for uncertainty will first be considered.

Section 10 of the General Timber Sale Regulations, attached to and made a part of the contract, was as follows:

"10. Selective logging, or the logging of areas in such manner as to preserve a part of the merchantable timber, promote the growth of young trees, or preserve the forest cover, will be practiced on all lands chiefly suitable for the production of timber crops. Live trees of diameters below those named in the contract may be designated for cutting, and larger trees may be reserved from cutting in the discretion of the officer in charge. If live trees which are not designated for cutting are cut, or are seriously injured through lack of care, they will be double scaled and so charged and paid for. In the discretion of the officer in charge, a strip not exceeding three hundred (300) feet in width on each side of streams, roads, and trails and in the vicinity of camping places and recreation grounds may be reserved, in which little or no cutting will be allowed."

The exceptions contained in the main body of the contract, plus the power to reserve, as expressed in the regulation just quoted, were thought by the trial judge to give the Government a virtually unlimited option to determine the extent to which cutting would be permitted, leaving the purchaser's promise to buy without consideration. It was further thought that the retained powers made the calculation of damages impossible, since there was no way of knowing how much timber the buyer would be permitted to cut. The argument, based partly on the wording of the contract and in part on extrinsic evidence, is that the estimate of merchantable live timber, as contained in the contract, was not an estimate of the quantity sold, but merely of the total quantity of the designated size.

We think the contract is not reasonably open to the construction given it. There was an express agreement to buy and log off "all the timber covered by this contract." The minimum of 20,000,000 feet required to be removed annually, multiplied by the number of years given for completing the operation, emphasized the definite nature of the buyer's promise. A correlative obligation to sell is reasonably to be inferred. See Williston on Contracts (Rev. Ed.), Vol. 1, § 90; Delaware & Hudson Canal Co. v. Pennsylvania Coal Co., 75 U.S. 276, 289, 8 Wall. 276, 289, 19 L.Ed. 349. Taking the instrument as a whole, we believe the estimate of quantity is fairly to be construed as an estimate of the amount of timber the seller undertook to designate for cutting. And we think this construction is fortified by the extrinsic facts.

The circumstance emphasized below was that a cruise of the tract had been made by the Indian Service in 1914 and a valuation survey conducted in 1924. It was believed that the estimate found in the contract was intended merely as a recital of the total stand of trees fourteen inches and over as shown by the cruise. However, the 1914 cruise was a general cruise covering a much larger area than that involved here. On other parts of the reservation covered by the same cruise there had been cut more than 150,000,000 feet of timber. A witness for the Government testified that the data had been in existence so long and so many forties had been cut over that "we have determined pretty well how it runs." The 1914 cruise, he said, was "a very conservative one." Again, "the estimate of volume on the Twin Lakes unit [the one covered by the present contract], considered by all men who know anything about it, is very conservative, and the amount cut in the areas we counted shows there was generally an overrun." His testimony is that there was unquestionably a good deal more volume than indicated by the estimate; and another witness stated that he had checked the cruise against the scale of logs taken out by the bankrupt, and that the scale was about 5% over the cruise.

That the area contained a substantially larger volume of timber than indicated by the cruise was a fact apparently long known to the Government; nor can there be much doubt that it was a matter of com-

mon knowledge among logging concerns operating in the locality. Its familiarity with the conditions made it possible for the Indian Service to determine with reasonable certainty the amount of timber available for selective logging, and therefore the amount the Government could safely agree to sell. On the other side, it was necessary for the purchaser to make the heavy initial outlay involved in building the railroad referred to earlier in the opinion. An expense of such magnitude would not be justified had either party assumed, as did the trial court, that the contract gave the purchaser "a mere conditional and revocable license" to cut. An obligation on the part of the Government commensurate with the burden undertaken by the purchaser is reasonably to be implied. Delaware & Hudson Canal Co. v. Pennsylvania Coal Co., supra.

There is no showing that the tract embraced any patented lands or mining claims, or any lands open to entry under the provisions of the homestead laws. The record does show that the areas referred to in the exceptions as "rugged and inaccessible" amounted to nothing on the Twin Lakes unit, "because it was pretty well out of the mountains." Both the logging company and the Forestry officials were familiar with the area and with the lumber industry. They knew conditions and presumably were aware of the possibilities of the tract for selective logging. They well understood that the discretion to reserve lodged in the seller was not one to be exercised arbitrarily, but within the limits of the purposes for which the power was retained; and these purposes were clearly expressed in the agreement. The parties no doubt contemplated, and the intent is fairly to be gathered from the contract, that where timber was reserved in the exercise of the discretionary power, other timber on the tract would be substituted.

 Whatever view be taken, the unconditional agreement of the Government to sell all the merchantable dead timber in the area furnished consideration for the promise of the purchaser to buy the live as well as the dead timber. Williston on Contracts (Rev.Ed.), Vol. 1, § 141; Meurer Steel Barrel Co. v. Martin, 3 Cir., 1 F.2d 687, 688; Warner v. Channell Chemical Co., 121 Wash. 237, 208 P. 1104; Sultan R. & Timber Co. v. Great Northern R. Co., 58 Wash. 604, 109 P. 320, 1020; Dent Lumber & Shingle Co. v. Cedarhome Lumber Co., 141 Wash. 593, 252 P. 141. We are here concerned only with the question whether the contract was supported by consideration, not with questions of mutuality of remedy which might be involved in an action for specific performance.

2. On the subject of damages, the following paragraphs of the Timber Sale Regulations are pertinent:

"52. Suspension of the purchaser's operations may be made by the officer in charge if any requirements of the contract and of these regulations are disregarded and until there is satisfactory compliance. Persistent failure to comply with any one of the requirements of the contract or regulations after written notice addressed to the purchaser by the superintendent or the officer in charge will be ground for revocation by the officer approving the contract of all rights of the purchaser under this and other contracts and the forfeiture of his bond and of all moneys paid, and the purchaser will be liable for all damage resulting from his breach of contract."

"54. The decision of the officer approving any contract will be final in the interpretation of the contract and of the regulations, and the terms of the contract or regulations can not be varied in any detail without the written approval of the officer approving the sale."

"56. Failure of the purchaser to complete his contract or to log promptly an area damaged by fire, wind, insects, or other causes, or the commission by him of any act for which the officer approving his contract shall declare the contract forfeited, will render the purchaser and his bondsmen liable for the depreciation in the value of the remaining timber on an estimate of value and quantity to be made under the direction of the officer approving this contract."

██ ██ In line with the authority assumed to be given in the paragraph last quoted, an estimate of damages was made by the valuation engineers of the Forestry branch of the Indian Service. It is urged here that the estimate was not made "under the direction of the officer approving the contract", as contemplated by the regulation. The point is without merit. The contract was approved by E. C. Finney, acting Secretary of the Interior, and it is inferable from the record that the damages were es-

timated under the direction of First Assistant Secretary of the Interior Dixon. The regulation does not refer to the individual, but to the officer. Moreover, the point was not presented below, the only objection to the appraisement being that it failed to apply the correct measure of damages.

The engineers undertook to determine, as of the time of breach, "the present fair value of the timber in the Twin Lakes unit for resale purposes, under existing conditions in the lumber industry and with the assumption that there will be an upward trend in the lumber market." This value was determined to be $2.75 per thousand for yellow pine and $.75 per thousand for fir and larch. These unit rates were applied to the estimated volume of merchantable live timber remaining to be logged, the net being determined by deducting from the gross volume covered by the contract the amount which had been cut and the amount which had been damaged by fire.

The contract prices for the same timber were taken to be those stipulated for the period from April 1, 1929, to March 31, 1932, that is, $3.47 per thousand for yellow pine and $1.14 for fir and larch. The difference between the two sets of figures—$188,711.25—was said to be "the depreciation in value established by the Government engineers."

The figures used in the computation included the timber on both unallotted and allotted lands. It appears, however, that a small but undetermined area of the allotted lands had not been contracted for with the Indian allottees. Accordingly, on the appeal the Government has abandoned its claim for damages in respect of allotted lands. It asserts that there was, at the least, a subsisting obligation to purchase 232,190,000 feet of timber on the unallotted lands. Attributing to the unallotted lands all the timber cut and damaged by fire (23,456,410 feet), it is said that the bankrupt was, as of the date of the breach, bound to remove and pay for, at the minimum, 113,718,930 feet of pine and 95,014,660 feet of fir. The calculation is indicated in the table shown in footnote.[1] The

| | PINE | | FIR | | TOTAL |
|---|---|---|---|---|---|
| [1] Estimated board feet specified in the contract on all lands allotted and unallotted (R. 67) | ........ | 217,280,000 | | 119,840,000 | 337,120,000 |
| Estimated volume of timber on allotted lands (R. 67–68) | ........ | 87,440,000 | | 17,490,000 | 104,930,000 |
| Estimated volume of timber on unallotted lands (R. 67) | ........ | 129,840,000 | | 102,350,000 | 232,190,000 |
| Amount of timber on allotted and unallotted lands actually cut prior to breach (R. 103) | 9,347,070 | | 3,211,340 | | 12,558,410 |
| Volume of timber on allotted and unallotted lands injured by fire which was not removed by the purchaser as required by the terms of the contract (R. 103) | 6,774,000 | | 4,124,000 | | 10,898,000 |
| | | 16,121,070 | | 7,335,340 | 23,456,410 |
| Net volume to be considered in valuation of the timber | ........ | 113,718,930 | | 95,014,660 | 208,733,590 |

relative valuations on this basis are also shown below.[2] With this adjustment as to quantity, it is said in appellee's brief that "the damages suffered by the United States through the breach with regard to the unburned timber, computed according to the contract and in the manner used by the valuation engineers, amounts to $118,933.34."

To proceed with the discussion, we think it is plain that the refusal of the purchaser to perform amounted to a renunciation of its entire contract obligation. The Government was entitled to treat the refusal as an anticipatory breach giving rise to a present right of action for damages. Roehm v. Horst, 178 U.S. 1, 20 S.Ct. 780, 44 L.Ed. 953; Central Trust Co. v. Chicago Auditorium Ass'n, 240 U.S. 581, 36 S. Ct. 412, 60 L.Ed. 811. The trial court, while in accord with this view, was of the opinion that in computing damages the contract prices would have to be compared with unpredictable market prices to prevail at the time of performance—an obviously impossible task.

It seems to have been thought that the Government might have put itself in position to establish its damages by suing from time to time during the period set for performance, or by awaiting the expiration of the whole term. However, the Government had little choice in the matter. The purchaser was in bankruptcy and it was necessary to liquidate its property and pay its creditors without undue delay. But even if it were practicable to follow the suggested procedure, the damages could not be determined with any degree of certainty by this mode of proof.

The contract was not one for sale or delivery in instalments. The purchaser, it is true, was bound to log off an annual minimum, but it had an unlimited right to remove the timber as rapidly as it was able. Because of the step-up in prices with each three-year period, and perhaps for other reasons, it might well have been of advantage to the logging company to remove much larger amounts of timber during the earlier years, or more during some years than others. It is thus plain that even if it were possible to forecast market prices, or if they were certainly known, no computation of damages would be feasible on the basis of such prices except by resort to assumptions at once arbitrary and insupportable.

The Government was entitled to be put as nearly as possible in as good a position as it would have been in had the purchaser performed its contract, Miller v. Robertson, 266 U.S. 243, 257, 45 S.Ct. 73, 69 L.Ed. 265; Metropolitan Casualty Ins. Co. v. United States, 9 Cir., 87 F.2d 144. As said in Illinois Central Ry. Co. v. Crail, 281 U.S. 57, 50 S.Ct. 180, 181, 74 L.Ed. 699, 67 A.L.R. 1423, "the test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable." Since the formula attempted to be applied below did not fit the special circumstances of the case, the trial court should have discarded the formula. Instead, it rejected the claim. This was altogether too narrow a view of the court's function.

There is analogy between the situation here and cases involving contracts of sale of staple commodities for future delivery. Roehm v. Horst, supra; Cron & Dehn v. Chelan Packing Co., 158 Wash. 167, 290

---

[2] Valuation of the net volume of timber in the Twin Lakes Unit after deduction of timber cut and removed by the purchaser, injured by fire and standing on allotted lands (see footnote 1, supra), based on the prices stipulated in the contract for the period April 1, 1929, to March 31, 1932:

Pine, 113,718,930, at $3.47 per M..............................$394,604.49
Fir and other species,
95,014,660, at $1.14 per M.................................. 108,316.71

Total value .............................................$502,921.40

Valuation of the same timber at the rates determined by the valuation engineers to represent market value of similar contracts for similar stands of timber:

Pine, 113,718,930, at $2.75 per M.............................$312,727.06
Fir and other species,
95,014,660, at $0.75 per M.................................. 71,261.00

Total value ................................................ 383,988.06

Total damages (depreciation in value)....................... 118,933.34

P. 999; Samuels v. E. F. Drew & Co., 2 Cir., 292 F. 734. In these cases it is held that an anticipatory breach effects a premature destruction of the contract, and that the injured party is entitled to compensation measured by the value of the contract at the time of its destruction. This value is to be determined "by taking the difference between the contract and market prices on the date of the breach for the same quality of goods, not for immediate delivery, but for delivery at the time and place specified in the contract." Samuels v. E. F. Drew & Co., supra, 292 F. 738.

We gather that this was substantially the measure applied by the officials of the Indian Service. The effort appears to have been to determine the fair market value of the timber on the date of the breach for purposes of a sale on terms customary in the lumber industry, presumably comparable with those of the breached contract and involving a similar logging program. The language used in stating the method of appraisement is consistent with such purpose. There is nothing to indicate that the attempt was to compare the contract prices with existing market prices based upon an immediate sale for cash.

The appraisement determined "the depreciation in the value of the remaining timber." It is urged that the word "depreciation", as used in regulation 56, does not comprehend a mere decline in market value, but means a physical deterioration of the timber. However, the Department interpreted the regulation otherwise, and it was stipulated in paragraph 54 that the decision of the officer approving the contract "will be final in the interpretation of the contract and of the regulations." The interpretation is reasonable. Paragraph 52 makes the purchaser liable for "all damage" resulting from his breach of contract, and the provisions of paragraph 56 may be taken as outlining the specific method by which all damages are to be determined.

It is well settled that parties to a contract may themselves make provision for the measurement of damages in the event of a breach. Such provision, if not unreasonable, will be given effect. Hill County Cotton Oil Co. v. Jonas, 5 Cir., 29 F.2d 327, 329, certiorari denied 279 U.S.

846, 49 S.Ct. 343, 73 L.Ed. 991; Star Publishing Co. v. Knosher & Co., 62 Wash. 215, 217, 218, 113 P. 569, 570; Sheffield-King Milling Co. v. Jacobs, 170 Wis. 389, 402, 403, 175 N.W. 796, 801, 802. The determination of damages under the direction of the Secretary of the Interior was a duty imposed by the terms of the contract.[3] It is to be presumed that this duty was performed. United States v. Shrewsbury, 23 Wall. 508, 23 L.Ed. 78. No objection was made below to the form of the determination, or to its substance otherwise than as has been indicated. The claim filed by the Government was based on "an estimate of value and quantity" made in the manner and by the means contemplated by the contract. The determination was at least prima facie correct, and should be accepted in the absence of a showing of fraud or bad faith.

We think the claim to the extent of $118,933.34 is amply sustained by competent evidence and should be allowed as a prior claim. The revised computation by which the amount is arrived at does not involve a departure from the basis used in the estimate of the Indian Service, and does not invalidate its appraisement. It is true that part of the amount represents present payment of sums which would not have been paid until a later time if the contract had been performed. However, that was a risk taken by the bankrupt; and in any event the advantage to be derived from present payment is more than offset by the increased prices to prevail in subsequent periods as provided in the contract.

3. As damages for failure to remove the timber injured by fire the Government claimed the full contract price, amounting to $28,207.14. The claim was based on an estimate made under the terms of paragraph 56 of the regulations and upon the following clause of the contract: "Should merchantable timber be injured by a forest fire for the origin or spread of which the purchaser, his agents, employees, subcontractors, or their employees, are in no way responsible, said purchaser shall be accountable for the loss sustained only to the extent that such loss shall be due to his failure to cut and remove the injured timber as expeditiously as shall be possible

---

[3] The contract was made under authority of the Act of June 25, 1910, 36 Stat. 855, authorizing sales of timber to be made under regulations to be prescribed by the Secretary of the Interior.

under the existing circumstances and the terms of this contract."

The burn was tributary to the company's logging railroad and was all on un-allotted lands or on allotments covered by contracts of the purchaser with the Indian allottees.[4] The referee held the bankrupt responsible for $14,103.57 of the damage, and, after appropriate deduction for certain advance payments, allowed the claim in the amount of $9,573.43. The allowance was confirmed by the court.

The dispute revolves around the construction of a letter dated January 7, 1931, from the Assistant Commissioner to the Superintendent of the Colville Agency, a copy of which was transmitted to the bankrupt. It will be recalled that the fire occurred in August, 1930. The letter, so far as material, is as follows:

"It is a matter of general knowledge that timber thus burned must be cut before the summer season following the fire, and in fact deterioration will begin not later than May 1, 1931, and possibly earlier. All of the burned timber should be removed prior to that time and to accomplish this effective action must be taken in the near future. * * *

"You will, accordingly, immediately advise both the Hedlund Lumber & Manufacturing Company and the Chinook Lumber & Manufacturing Company that the full contract price of the timber injured by fire is approximately $28,207.14, that the purchaser must be held responsible for the loss that will be suffered if this timber is not cut before the coming summer, and that the Indian Service estimates that a loss of approximately one-half this amount, or $14,103.57, will occur unless the timber is removed before May 1, 1931."

The letter was construed by the referee as an estimate of a maximum possible salvage of $14,103.57, provided the timber was removed before the following May. However, that is not what the letter says.

It says that an estimated loss of approximately one-half the contract price will occur unless the timber is cut before May 1. The converse inference is that if the burn were logged before that time no loss would result, this for the reason that "deterioration will begin not later than May 1, 1931, and possibly earlier." This construction is borne out by the oral testimony. It was shown that the fire made prompt removal necessary in order to prevent deterioration, which would begin with the coming of summer. The timber became a total loss as the result of the failure to cut it, and the claim of the Government should be allowed in full.

Upon the purchaser's breach, the Indian Service promptly advertised the damaged timber for sale at a minimum price of $1.50 per thousand for pine and $.50 per thousand for other species, but obtained no bids. Appellee argues that the Government failed to mitigate the damages either by cutting the timber or by selling it at the best price obtainable. The point was not made before the referee or on review before the trial judge. There is no showing that in establishing the upset price the Government failed to exercise reasonable business prudence, or that any bids would have been received even though minimum prices had not been set. The burden of proof on the question of mitigation was on the trustee. 15 Am.Jur. § 331; Standard Growers' Exchange v. Hooks, 5 Cir., 22 F.2d 599; Arkley Lumber Co. v. Vincent, 121 Wash. 512, 209 P. 690. In the absence of evidence to the contrary it is to be presumed that the measures taken by the Government were all that in reason could be required.

4. Advance payments in the total amount of $41,182.46 had been made by the purchaser at the time of the breach. To this extent the damages of the Government have been liquidated, and the amount should be deducted from the total claim.

Reversed.

---

[4] On this point the record is conflicting. There was some evidence that part of the burned timber was on two allotments not covered by contracts. However, the referee and the trial court must necessarily have resolved the conflict in favor of what is said in the text.