**UNITED STATES v. DESCHUTES PINE TIMBER CO. et al.**

**DESCHUTES PINE TIMBER CO. v. UNITED STATES.**

No. 20701.

District Court, W. D. Washington, N. D.
April 22, 1940.

J. Charles Dennis, U. S. Atty., of Seattle, Wash., for plaintiff.

Preston, Thorgrimson & Turner, Leander T. Turner, and Charles Horowitz, all of Seattle, Wash., for defendant United States Fidelity & Guaranty Co.

Jones & Bronson and W. L. Grill, all of Seattle, Wash., for defendant Deschutes Pine Timber Co.

BOWEN, District Judge.

The plaintiff, United States of America, sues to recover from the defendant Deschutes Pine Timber Company the sum of $270,900.80 for breach by the defendant of a contract for the purchase of approximately 526,000,000 feet of timber on the Metolius Logging Unit of the Warm Springs Indian Reservation in Oregon. Of that sum plaintiff seeks to recover $40,000 only against defendant United States Fidelity & Guaranty Company on its surety bond given for the faithful performance by the other defendant of the purchase contract. The primary, or as called by counsel, "the master", contract was entered into on January 22, 1923, between the Superintendent of the Warm Springs Agency on behalf of the Confederated Tribes and Bands of Middle Oregon, as seller, and the River Logging and Lumber Company (which later changed its name to Deschutes Pine Timber Company), as purchaser. The form and terms of the contract with the exception of the identity of parties and the location, kinds, amount and contract price of timber were in all material respects identical with the contract involved in the case of United States v. Harris, 9 Cir., 100 F.2d 268, to which reference is made for greater detail of the contract provisions. There were also made a part of this contract the same timber sale regulations which were involved in the Harris suit. Certain salient facts will later appear. Many of the questions in issue here were involved in the Harris case.

Some of the payments required by the contract in suit were made by the purchaser but the payments were usually delayed and in fact nearly all of the partial performance made by the purchaser was most desultory in character. With the exception of relatively short periods of time usually following immediately after extensions of time after partial payments were accepted by the Government, there was scarcely any time when this contract was not in default so far as the purchaser's performance was concerned. Finally after repeated defaults and long periods of default the Government undertook definite steps in 1931 to declare the contract terminated and succeeded in making all parties understand that the contract was cancelled as of March 21, 1931. After that, however, the Government delayed suit because of certain renewed efforts at rehabilitation of the contract by and on behalf of the purchaser and the defendant Surety Company. Some such action on behalf of the purchaser is indicated by a letter written March 19, 1931, by Henry Scattergood, Assistant Commissioner of Indian Affairs, to the Secretary of the Interior, in which the writer said among other things: "Subsequently this office notified Mr. J. P. Van Orsdell on February 19, 1931, who visited this Office for the Company, that if the cash payment of $30,000 was made, in payments of $5,000 immediately, $10,000 additional on or before March 21, and $15,000 on or before April 21, 1931, an extension of time until October 1, 1931 might be given the Company within which to begin construction of a sawmill and appurtenances necessary to the logging and milling of this timber."

Those further negotiations and the indulgent attitude of the Government resulted in postponement of suit until August 1932 when the present action was finally commenced.

The question in this case of greatest concern to the court in determining the issue which is indispensable to the plaintiff's maintaining this action turns on the breach of the contract and when the breach occurred. In view particularly of the Washington state authorities cited by counsel, it seems to me that a breach could have been claimed by the plaintiff, United States of America, on almost any day subsequent to that last extension of time and part payment which occurred in the year 1928. The Government was reluctant to take steps to terminate this contract or declare a breach of the contract. In view of all the circumstances, the court finds that the breach of this contract occurred before and not later than March 21, 1931, which date was properly treated

as the performance dead line and cancellation date of the contract, and that the Government in undertaking to measure the damages as of that date was acting within the authority not only of the Washington state court cases cited by counsel but also within the authority of the case of Metropolitan Casualty Insurance Company v. United States, 87 F.2d 144, decided by the 9th Circuit Court of Appeals. That case is authority for the action of the Government in measuring the damages as of the date when the contract in suit was cancelled because here, as in the Metropolitan Casualty Insurance Company case, there was a continuing contract calling for further performance after date of cancellation. For that reason, computing the damages as of the date of cancellation, as was done in the estimate later to be discussed, does not under the rule of the Metropolitan Casualty Insurance case prejudice either of the defendants.

Before cancellation was finally made the Government had been exceedingly fair and indulgent in trying to avoid a termination of the contract with the hope that the defendant purchaser would some day be able to perform it. Prior to the 1928 modification there had been long and successive defaults, with different arrangements for modified performance and time extensions consented to by the surety. Subsequent to the 1928 modification, the purchaser continued in default against the repeated protests and without approval of the Government and in spite of its demands for performance by the purchaser. When the contract was finally cancelled the defendant surety was still bound under its bond for the performance of the uncompleted contract. As stated in the quoted language in the Metropolitan Casualty Insurance case, supra, 87 F.2d 144, at page 146, "The rule as respects the time for computing value is not without flexibility where justice requires it." Under all the circumstances here, and, as regards the surety, since the full penalty of the surety's bond is far below the damages sustained by the plaintiff and computed as of the cancellation date, measuring the damages as of that date works no prejudice against the defendants.

■ The court is of the opinion and decides that this contract, as to what circumstance or occasion gives rise to the cause of action herein sued upon, is not materially different from other ordinary contracts. In contracts generally the breach of performance of them rather than the act of computing the damages is what gives rise to a cause of action for damages for failure to perform, and in that respect this case is not different from the ordinary one. It is true that here the contract calls for an estimate to be made by the official who approved the contract, but that requirement was merely the means of determining the amount of recovery and was an incident following not creating the cause of action. The breach of the contract by the purchaser's persistent failure to perform it created the cause of action and the making of an estimate of the remaining timber and its value was an incident that was to follow the breach of the contract in case the Government should sue upon the contract because of its breach. Defendants' contention that a correct estimate made after the breach and within the coverage period of the performance bond was necessary to create a valid cause of action cannot prevail.

■ Now follows the question whether or not a valid estimate ever was made, sufficient to support any recovery in this case. Defendants assert that no valid estimate was made because no new cruise of timber was made after breach of the contract independent of the original cruise made prior to the making of the contract, and because the estimate included two improper elements of damage, namely, the item for pine beetle infestation not recoverable under the contract and the item for damages for breach of the individual allotment contracts which in fact were not broken except as they were affected by the breach of the master contract.

The estimate in question is provided for in the contract, but it is to be noted that a new cruise after the breach of the contract and independent of the original cruise is not specifically called for, that use of previous cruises is not prohibited and that the contract does not purport to otherwise fix the method or means of making the estimate other than to stipulate who shall make it. That stipulation does not mean that the officer approving the contract for the Government should personally make the estimate without aid from his assistants and subordinates. The contract does not provide that the assistants or subordinates of the officer approving the contract shall or shall not assist that officer, nor that known data already in existence may not

be used instead of new data acquired after the breach of the contract, nor that the estimator shall after the breach go upon the ground and make a new count of the trees instead of taking as a basis the timber cruise made in previous years, nor is the estimator deprived of discretion as to the method and means of making the estimate. The contract does not direct or control such method or means, nor the discretion of the estimator in making the estimate. A fair and reasonable estimate by or under the direction of the proper officer is all that was required.

■ The court finds that the first estimate, the one made in 1932, was made by the proper official, the Assistant Secretary of the Interior, by his approving and including with his letter of June 13, 1932 to the Attorney General the estimate and recommendations of the Commissioner of Indian Affairs for the commencement of suit. Later that estimate was corrected in amount and in some other details in a manner more favorable to the defendant purchaser, with the result that the amount of the damages fixed by the first estimate at $276,886.40 was reduced in the corrected or second estimate, the one made in 1933, to the sum of $270,900.80, and the second estimate, likewise made by the proper officer, occasioned the filing of the third amended complaint on which the action was tried. There is no element in the estimate, either the first or second, which is incapable of fair correction or which after correction necessarily defeats the existence, at the inception of suit, of a valid cause of action, especially in view of the fact that neither defendant is prejudiced by such correction. In both estimates, items for damages for beetle infestation and for breach of individual allotment contracts were erroneously included, but the amounts allowed for those two erroneous items are known or may be accurately determined by calculation. The second estimate was not otherwise erroneous. The record discloses no fraudulent purpose on the part of any Government official or employee in connection with the inclusion of those two items. Their inclusion in the estimate is apparently the result of oversight or mistake, a result likely to happen from a change in personnel where the successor in office may and sometimes does overlook information which his predecessor might not have overlooked if the latter had handled the matter to conclusion. After deduction of the two erroneous items, the estimate is fair and reasonable, being otherwise based upon a proper basis for determining the damages.

In view of all the facts and circumstances disclosed by the record the court is of the opinion and decides that the contract in suit was breached and the cause of action therefor herein sued upon arose within the five year life of the 1928 bond of the defendant Surety Company; that the two items of damages, one for beetle infestation in the sum of $21,600, and the other in respect to allotment contracts in the sum of $20,726.88, erroneously included in the estimate, should be deducted therefrom; that judgment should be awarded against defendant Deschutes Pine Timber Company for the remainder of the damages estimated in the corrected estimate in the sum of $270,900.80 after deducting said two erroneous items; and that, since said remainder is far in excess of the maximum amount of the surety's obligation, judgment should be awarded against the defendant Surety Company for the full amount of its bond, which is $40,000.

This will take the place of the court's decision announced orally at the close of the argument of counsel on April 19, 1940.